James Patrick BRADLEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–95–00383–CR.

Court of Appeals of Texas,
El Paso.

Aug. 29, 1997.

Rehearing Overruled Oct. 8, 1997.

Matthew DeKoatz, El Paso, for Appellant.

Jaime E. Esparza, District Attorney, El Paso, for Appellee/State.

Before BARAJAS, C.J., and LARSEN and McCLURE, JJ.

### OPINION

BARAJAS, Chief Justice.

This is an appeal from a jury conviction for the offense of murder. The jury assessed punishment at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice and a fine of $10,000. We affirm the judgment of conviction.

## I. SUMMARY OF THE EVIDENCE

Prior to trial, Appellant filed a motion to suppress his confession alleging that as a result of custodial interrogation, he confessed to law enforcement officers. The motion also alleged that the confession was involuntary in that he was questioned for over ten hours prior to making the statement; also, his request to speak to counsel was denied. Further, Appellant alleged that he was both mentally and physically incapable of executing a voluntary statement. Appellant additionally filed a motion to suppress the evidence obtained as a result of a search of his residence asserting that the search warrant was issued without probable cause.

At the hearing on the motions to suppress, Alfonso Marquez, a detective with the Crimes Against Persons Unit of the El Paso Police Department testified that on February 21, 1995, he went to 5409 Olson Street in El Paso County, Texas, at approximately 4:25 in the morning. He was accompanied by several other detectives and members of the Identification and Records section of the police department. They went to this address to inquire concerning the various body parts of an individual that had been located in various

parts of the city. Marquez, Detective Ruiz, and a uniformed officer went to the door of the residence and met Appellant. The detectives identified themselves and entered the house. Appellant walked from the front door to a couch. Marquez noticed some small blood spots on the carpet. He inquired regarding the whereabouts of Appellant's wife and he responded that she had gone to Ruidoso, New Mexico with an African–American male named Jones and a white female.

Detective Marquez noticed a shotgun laying near the couch. He asked Appellant if he would accompany them to the police station to view photos of the body parts to determine the identity of the victim. Appellant agreed but stated that it probably was not his wife as she was in Ruidoso. He rose from the couch with the aid of a walker and went to a rear bedroom. He sat on the bed and started to cry. Appellant then related that his wife had rejected a ring he bought for Valentine's Day and that she didn't want him. Detective Marquez testified that, as a precautionary measure, he read Appellant his *Miranda* warnings. Appellant verbally acknowledged each right listed on the card and waived each of those rights. He signed and dated the card. Detective Marquez related that Appellant did not request an attorney; that he did not coerce Appellant to waive his rights or promise him anything in return for speaking to the officers. The witness stated that Appellant was fully coherent and was not under the influence of alcohol, narcotics, or medication. At Appellant's request, Detective Marquez got his wheelchair.[1]

When they got outside, Appellant asked about the presence of the other officers and another officer, Detective Castro, stated they had a search warrant. Appellant stated they did not need a search warrant and that he would give consent to search his house. Appellant was read his *Miranda* rights a second time and Detectives Ruiz and Castro went through the consent to search form with Appellant. Marquez related that there was no difficulty in communicating with Appel-

lant, that he did not ask for an attorney, and he did not appear to be under the influence of alcohol or narcotics when he signed the consent to search form. Detective Marquez testified that Appellant was not threatened, coerced, or promised anything in exchange for the consent to search. The consent to search form stated that the Appellant was informed of his constitutional right not to have a search made of the premises without a search warrant and of his right to refuse to consent to such a search. It authorized the officers to search the house, storage sheds, yard, vehicles on the property, and it allowed the officers to take any letters, papers, materials, and other property from the premises. The document was signed and dated by Appellant and was witnessed by two of the officers.

Appellant and the officers proceeded to the central police station in El Paso. Appellant was not handcuffed. Once there, Appellant and Detectives Marquez and Ruiz initially went into a large interview room with a one-way mirror. There were chairs and a couch in the room. Appellant was offered coffee and cigarettes. The interview began at 5:15 a.m. Marquez testified that he would speak with Appellant for fifteen or twenty minutes and he would then leave the room and would observe Appellant through the one-way mirror to see how he was reacting while he was alone. Detective Marquez testified that he was in contact with the officers who where searching Appellant's house in order to know the results of the search.

Six hours into the interview, Appellant began to cry and told him that he gave his wife a ring for Valentine's Day. She threw it in his face, stated that he could no longer dance, and struck him with a flashlight. Detective Marquez asked Appellant if he killed his wife, dismembered her, and deposited the body parts all over the city. Appellant stated, "You may think I'm an animal, but I did do this to her." Marquez then turned Appellant over to Detective Ruiz at 11:20 a.m. for a written statement. Once again, Detective Marquez testified that during the period of

1. We note that at trial, Detective Marquez initially stated that Appellant was not free to leave but finally stated that, 'If [Appellant] had stated he didn't want to come with us, he could go wherever he wanted to go.'

time from 5:15 to 11:20, Appellant never requested an attorney and was never coerced or threatened. He was not promised anything, was allowed to use the restroom, and was not denied food or cigarettes. Marquez stated that Appellant was not under the influence of alcohol or any drug or narcotic substance. Appellant made no complaints regarding suffering any pain although he did state that he suffered from a rare blood disease. Although Appellant asserts that he had asked that his medication be brought to him at the police station, Marquez stated that, during the interview, Appellant never asked for the medication nor did he appear to be in need of any medication.

On cross-examination, Detective Marquez stated that he was aware of the existence of the search warrant but he did not know that it contained a provision for the arrest of Appellant. He stated that Appellant was not taken to a magistrate until the termination of the interview. Marquez testified that he did not withhold the medication in order to coerce a confession.

Detective Arturo Ruiz testified that he accompanied Marquez and other officers to Appellant's residence at 5409 Olson to meet with Appellant. Appellant was told that they needed to speak to him about his wife's disappearance and Appellant told them to come into the house. Appellant agreed to go with the officers to the police station. He followed Marquez into the house and arrangements were made for him to put on some clothes. Appellant went into a bedroom where he was advised of his *Miranda* rights. Appellant indicated that he understood his rights—he was cooperative, coherent, and he was not under the influence of alcohol or drugs. He observed Appellant sign the warning card.

When advised by Detective Castro that they had a search warrant for the house, Appellant responded that he had nothing to hide and they did not need a search warrant. Ruiz explained the form to Appellant and allowed him to review it. Appellant stated that he understood the form and he signed it. Ruiz stated that Appellant was advised that he could consult an attorney. He was not threatened, coerced, or promised anything to sign the form.

Appellant went to the police station. Ruiz was instructed to take Appellant's medication to the police station. Ruiz got the medicine and arrived at the police station at about 5:45 a.m. He told Appellant that he had brought the medication to the police department as requested. Ruiz testified that the medication was not brought to the station in order to entice Appellant to give a statement. Ruiz encountered Appellant at the interview room—he was not handcuffed. The witness read the warnings to Appellant again and Appellant waived his rights. When Appellant admitted verbally to Marquez that he had killed his wife, Ruiz administered the warnings again and Appellant waived his rights and agreed to give a written statement. The witness testified that Appellant was not threatened, coerced, or promised anything in obtaining the statement. He was not denied any necessities such as food, restroom usage, or cigarettes. Appellant drank coffee and water during the interview but turned down the offer of food. Appellant related that the last time he had taken his medication was at approximately 11:30 p.m. Appellant did not appear to be under the influence of drugs or alcohol. Ruiz stated that Appellant never asked for this medication and it was never posed to Appellant that he would get his medication if he gave a statement. It never appeared that Appellant was in pain.

The record shows that in order to type the statement, Detective Ruiz and Appellant moved to an office cubicle where a computer terminal was located. Ruiz logged on to the computer at 11:30 a.m. Appellant was seated in his wheelchair and was allowed to smoke. He could view the computer screen as Ruiz typed the statement. At the conclusion of the statement, Appellant requested that Ruiz add that his therapist knew about his wife's abuse of him and this statement was added. Appellant reviewed the statement and stated that it was correct. He was read his rights from the written statement and waived those rights. He signed and filled in the time that the statement was completed—1:30 p.m. Appellant initialed

each paragraph and the statement was witnessed by two other police officers.[2] After the signing of the statement, Appellant was told that he was being placed under arrest.

In Appellant's confession, he stated that on February 15, 1995, at about 11:00 p.m., he got into an argument with his wife, Suzy Bradley. She struck him in the head with a flashlight. He struck her on the nose with his fist and thought he broke her nose and a tooth. She went to the bathroom and asked Appellant to help her clean up. As he walked to the bathroom with the aid of his walker, she began yelling and struck Appellant and pushed him to the floor. She stated that she was going to call 911 and report him for spousal abuse. He retrieved a .22 caliber rifle. When she emerged from the bathroom, he shot her six times on the right side of her body. As he could not load her into his truck, he got an ax and chopped her body into pieces. He chopped off her legs and her hands and arms and then her head and fingers. He spray painted the body parts and drove to various areas of the city depositing the body parts. Appellant related that he spray painted the body to "get the fingerprints off." He then cleaned up the house and the tools to remove any possible evidence. Detective Jose Castro testified that he obtained the search and arrest warrant for Appellant and his residence. Castro informed Appellant that he had a search warrant for his home. Appellant told Castro that he did not need a search warrant and the officers could go into his house and look at anything they desired. Castro stated that Appellant was coherent and he signed the consent form voluntarily, without threats or promises. He did not ask for an attorney and he was not under the influence of alcohol or narcotics at the time he signed the form.

At trial, James Carter, the El Paso Criminal Law Magistrate testified that on February 21 at 3:39 p.m., Appellant appeared before him and was given his magistrate's warnings. Carter stated that Appellant appeared alert and responded appropriately. It did not appear that Appellant was under the influence of drugs or alcohol and he did not complain of any pain.

Also at trial, Rose Aguilar, the jail nurse, stated that she saw Appellant at approximately 4:20 p.m. on February 21. She testified that Appellant's only complaint was that he had a headache. He was calm and cooperative. He did not appear to be in any great pain. She gave him a pill that he specified from his medications for the headache.

Sergeant Jaime Avalos was the first witness during the State's case-in-chief. He testified that on February 17, 1995, he was dispatched to 900 Lee Trevino regarding some body parts that had been found. Upon arrival, he found two feet, a forearm, a knee, and a hand with severed fingertips. They were spray painted a blue-gray color. On February 18, he found the severed head of an individual at Burnham and Lomaland Streets on the side of the curb. A severed arm and a hand with the fingertips cut off were also found. They also were painted a bluish-gray color.

Officer Joseph Guerra stated that on February 19, he was notified by the Dona Ana County Sheriff's Department in New Mexico that various body parts had been found seven miles north of the state line. Upon arrival, he found a box loaded on a dolly cart covered by a green army blanket. Underneath was a headless and limbless human torso covered with silver and blue spray paint.

Lorena Esquivel testified that on February 20, she was cleaning the parking lot of a shopping center at Trowbridge and Montana Streets when she found two sandwich bags with fingers and fingertips in them. Officer Joe Hernandez responded to this incident and also found a kimono in the dumpster where the fingertips were found.

Detective Jose Castro testified at trial. He stated that on February 19, the police had discovered all the body parts except the fingertips found in the dumpster. As the victim was unknown, it was decided to show a picture of the victim's head on various televi-

2. Each of these officers testified that Appellant did not ask for an attorney, was not threatened or coerced, or promised anything. They stated that Appellant was not under the influence of alcohol or narcotics, and he freely and voluntarily signed his statement in their presence.

sion stations in order to effect an identification. A number of responses were received and it was determined that the victim was a woman named Suzy Bradley. The police obtained an address where she and the Appellant had lived. Castro obtained a combined search and arrest warrant for the home and Appellant. Castro was the affiant on the search and arrest warrant. However, the warrant was not executed as Appellant consented to the search of the home.

Detective Alfonso Marquez stated that Appellant never related to him that he had killed his wife in self-defense. Appellant also never stated during the interview that he was afraid for his life when he killed his wife.

Harvey McCune, a neurological massage therapist, testified that Appellant was his patient and he saw Appellant three times a week. On February 15, McCune went to Appellant's home for a treatment session. Appellant had a bruise on his forehead and he stated to McCune that the deceased had hit him on the head with a flashlight. Appellant told the witness that on February 13, he had given his wife a ring and she had thrown it back at him. He hit her and knocked her out. McCune stated that he heard the deceased's voice from another room.

On February 17, during another session, Appellant told the witness that his wife had gone to Ruidoso to do some painting with friends. Appellant appeared normal. On February 20, McCune administered another treatment and Appellant stated that the deceased was still in Ruidoso. McCune saw the television news that evening and he called Appellant and told him that he thought the head being displayed was his wife's. Appellant stated that it looked similar but it was not hers. McCune called the police and told them the identity of the head shown on television. On cross-examination, the witness testified that Appellant had told him the deceased had hit him with canes, sticks, and boards.

Victoria Adamson stated that she was a friend of the deceased and was friendly with Appellant. On February 20, she watched the six o'clock news and saw the head of an individual she believed to be Suzy Bradley. She called Appellant to relate what she saw. He sounded normal and told her that the deceased had gone to Ruidoso, New Mexico on a painting trip. She saw the head again on the late news and she called the police to tell them the identity of the victim.

Christopher Hahn, the victim's brother, related that Appellant called him on the morning of February 19 and stated that the deceased had gone on a trip to the Hondo Basin and he was worried about her. Other such calls followed and Hahn was uneasy about the situation.

Kimmett G. Bellows, a member of the El Paso Police Department Crime Scene Unit, stated that he assisted in the search of Appellant's residence on February 21. They searched for approximately eighteen hours. Bellows related that they found a carpet with blood stains and two sheets with blood stains. A can of spray paint was found and its color was similar to the paint found on the torso found in New Mexico. He found a note on a dresser which read:

> Morning of the 16th, 9:00. Suzy left with James to Ruidoso and Melissa, Hondo Valley, to sketch and do pastels. I worried. They were due back … Saturday. 85–86 Chevy van, blue mag wheels.

He related that a tooth was found in the toilet bowl and testified regarding a photograph of the tooth.

The witness went back to the residence for a second time on February 23. He found some spent .22 caliber cartridges cases, one live .22 caliber round, some spent .22 caliber bullets and one spent .32 caliber bullet. Appellant objected to these items prior to their identification stating that the second search exceeded the scope of the consent and the scope of the evidentiary search warrant. This objection was overruled. When the exhibits were offered after having been identified, Appellant objected that the requisite foundation had not been established. After it was established where the exhibits were found, Appellant stated that he had "no objection" to their admission.

On February 22, Officer Joe Hernandez stated that he found a bullet hole in the house and he testified to a photograph of the hole and a diagram of its location. He testi-

fied to another picture of a bullet hole and Appellant stated that he had no objection to its introduction.

David Spence stated he was a forensic chemist for the Texas Department of Public Safety specializing in trace evidence. Spence performed an analysis of the victim's kimono. He identified thirteen exit and entry holes in the kimono. The one excess hole was explained by one bullet passing through a fold in the garment. Based upon the fact that there was no gunshot residue on the kimono, the gun had to be a minimum of seven feet from the victim when it was fired.

Dr. Juan Contin, the El Paso County Medical Examiner, stated that the deceased's body had been cut into twenty-one pieces. The deceased weighed 135 pounds and was 64 inches tall. Dr. Contin found that the deceased had twenty pre-mortem bruises which were inflicted from one hour to two days prior to her death. Contin stated the bruising was not consistent with the fall from being shot. He found six bullet wounds to the chest and abdomen. The cause of death was internal bleeding. The toxicology report showed no alcohol or drugs in her system.

Dr. Cynthia Rivera was the first witness for the defense. The deceased was her patient. Rivera stated that the deceased suffered from post-traumatic stress disorder resulting from a sexual assault that occurred while she was in the army in Germany in 1988. For this affliction and major depression, Rivera prescribed Clonopin, a muscle relaxant for neck tension, and Zoloft for the depression. The deceased told Rivera that during the Christmas holidays in 1993, she would open the door after 9:00 p.m. with a gun and she stated that she would feel no remorse if she shot someone.

On cross-examination, Rivera indicated that this statement could have reflected self-preservation and would not necessarily indicate the deceased was a violent individual. She also stated that if a person were the batterer in an abusive first marriage, that individual would not become the victim in a second marriage as it would be unlikely that the person would give up the sense of power attained in the first marriage.

On redirect-examination, Rivera stated that Appellant had come to her in October 1994 and stated that she had thrown an ashtray at Appellant and that she was having problems with her husband.

Jackie Brackett testified that she was the manager of the La Posta Motor Lodge. She stated that Appellant stayed at the motel on February 8 and 9 of 1995. The next night he stayed in his car. On that date, the tenth, he received a phone call from the deceased. He became very nervous and upset—he asked her how she had found him. When Appellant hung up the phone, he was shaking and in tears. Due to the fact the deceased had found where he was staying, Appellant spent that night in his car rather than at the motel.

Dr. Brian August was Appellant's treating physician specializing in physical medicine and rehabilitation. He stated that Appellant suffered from a retro virus which caused an inflammation of the spinal cord and attendant weakness in the lower extremities. Dr. August prescribed Clonopin, a muscle relaxant. One side effect of the drug was sedation if taken to excess.

On cross-examination, August testified that Appellant had a tolerance for his medications and the Clonopin would not wear off immediately. The withdrawal effects would be jitteriness but there would be no immediate onset of pain just by starting or stopping the medication. He stated that the medications Appellant was taking would not be out of his system in eight hours.

Appellant testified in his own defense. He stated that he was 48 years old at the time of trial and was employed as a drug and alcohol abuse counselor. He related that he had an altercation with his wife on the afternoon of February 15, 1995. The argument was over a ring she had rejected. While he was in bed, the deceased threw a flashlight at him and he hit her in the face. She yelled at Appellant and told him to help her clean up. He did so and returned to the bedroom and put his walker up against the door. After twenty minutes, he called to the deceased to see if she was all right and he looked and saw the bathroom door was closed.

He then saw the deceased come out of the bathroom holding a shotgun and crouching. Appellant stated he was scared and upset. He grabbed a semi-automatic .22 under the bed and shot her several times. He stated that he did not intend to kill her but only intended to prevent her from firing the shotgun. He tried to dispose of the body by putting it in her truck but he could not do so and he dragged her body into the music room. He dismembered the body with a hatchet and disposed of the body parts over several days. He could not say why he had spray painted the body. Appellant stated that he had last taken his medication at 10 p.m. prior to the arrival of the police in the early morning of February 21. When the police came in the house, he spoke with Detective Marquez and agreed to go downtown. He stated that the police did not inform him he was a suspect. Appellant put on his clothes and was wheeled outside. He told the police they could search his home and they told him to sign the form. He informed Detective Marquez that he needed his medication.

Appellant testified that he was taken into an interrogation room at the police station and was kept there for seven hours. He stated that he asked for his medication but it was not given to him. Appellant stated that he asked for an attorney but the interview did not terminate. He testified that if he answered properly, the police would see what they could do regarding his medication. Appellant stated that as time wore on, he became very nervous and his legs were bothering him. He finally decided to give his statement so he could get his medication and ease his pain although his overriding consideration in giving the statement was because he "had done it."

On cross-examination Appellant related that his wife had beaten and bruised him and had taken advantage of him. He admitted to stating in a letter to his ex-wife that he was so drugged up that he did not know what he was doing during the interview—a differing statement from that given at trial. Appellant stated that he told the jail nurse that he needed his medication and he was in pain.

Out of the presence of the jury, the State notified the court that because Appellant had presented evidence that he had been abused by his wife and he testified that she was the first aggressor in the incident, the State intended to introduce evidence that Appellant had abused his ex-wife. The court granted this request and Appellant admitted that during his twenty-three year relationship with his ex-wife, he had beaten her, broken her jaw, and had committed a variety of violent acts against her and that it would be fair to characterize her as a battered spouse.

In the charge to the jury at the guilt-innocence stage of trial, the jury was charged on the law of self defense and the voluntariness of the confession. In the court's findings of fact and conclusions of law, the court found that the statements and consents made and given by Appellant to law enforcement officers were voluntarily made and given. Factually, regarding the voluntariness of the confession, the trial court specifically found:

1. That James Partick Bradley made an incriminating oral statement heard by Detective Marquez and gave a written incriminating statement to Detective Ruiz, on or about the 21st day of February, 1995.

2. That James Patrick Bradley gave oral and written consent to search his home at 5409 Olson, El Paso, Texas.

3. That prior to making the statements, James Patrick Bradley was warned of his rights under the Constitutions and Code of Criminal Procedure and intelligently, knowingly and voluntarily waived those rights before executing the document made a part of the record and entitled "Voluntary Statement of the Accused," the "Miranda Warning Card," and the "Consent To Search" form as well as before making the incriminating oral statement and giving the oral consent to search.

4. That before James Patrick Bradley signed the consent to search, it was read to him, he reviewed it, he was informed of his right to refuse consent and of his right to consult with an attorney.

5. That James Patrick Bradley was not coerced or enticed in any fashion, and was not under the influence of any alcohol, narcotic drug, or withdrawal from any such at the time of the making or giving any statement or consent.

6. That James Patrick Bradley was coherent and understood what was happening during the making and giving of all the statements and consents.

7. That the decision of James Patrick Bradley to make any oral or written statement was not influenced by the failure to take James Patrick Bradley immediately before a magistrate or by any other than the desire to give the statements.

8. That James Patrick Bradley willingly, without objection or coercion of any kind, cooperated with the police in the search of his home and the making and giving of statements to law enforcement officers.

## II. DISCUSSION

Initially, we address the State's assertion that Appellant has waived various contentions raised on appeal. Appellant's written motion to suppress his statements given to the police asserted that the confession should be suppressed because it was involuntary due to the 10 hour long questioning of Appellant, that it was taken in derogation of Appellant's right to counsel when that right was invoked, and it was involuntary because Appellant was mentally and physically incapable of executing a free and voluntary statement. At the close of the suppression hearing, Appellant did not argue any grounds for suppression stating, "Your Honor, I believe we'll defer to the Court. You've heard the testimony. I'm sure the Court can make a decision based on what it's heard." When the written confession was offered into evidence, Appellant stated that "[w]e renew our original objection."

■ A motion to suppress evidence is a specialized objection regarding the admissibility of evidence. *Galitz v. State,* 617 S.W.2d 949, 952 n. 10 (Tex.Crim.App.1981); *Carroll v. State,* 911 S.W.2d 210, 218 (Tex. App.—Austin 1995, no pet.). A motion must adhere to the requirements of an objection. *Mayfield v. State,* 800 S.W.2d 932, 935 (Tex. App.—San Antonio 1990, no pet.). An accused may not rely upon an objection on appeal not raised in the trial court. *Thomas v. State,* 723 S.W.2d 696, 700 (Tex.Crim.App. 1986). In Point of Error No. Two, Appellant asserts the court erred in its denial to suppress due to the failure to take Appellant before a magistrate without delay. In Point of Error No. Three, Appellant asserts that the court erred in denying the motion to suppress because the confession was the result of an illegal warrantless arrest. As these were matters not properly preserved, we find the Appellant has waived those contentions. Points of Error Nos. Two and Three are overruled.

Appellant's motion to suppress the evidence found from the search of his residence alleged a lack of "probable cause" for the issuance of the search warrant. When the written consent to search was offered into evidence, Appellant stated, "Our previous objection." The sole objection was contained in the motion to suppress. In Point of Error No. Seven, Appellant maintains that the consent to search was involuntary. In Point of Error No. Eight, he asserts that Appellant's consent was tainted by a illegal arrest. In Point of Error Fourteen, Appellant contends the court erred in admitting the evidence as it was the result of a second search of Appellant's residence. Once again, finding that the contentions found in the above points have not been preserved on appeal, we overrule Appellant's Points of Error Nos. Seven, Eight, and Fourteen.

■ In Appellant's Points of Error Nos. One and Four, he asserts the trial court erred in denying his motion to suppress his statements because the statements were involuntarily obtained. On a motion to suppress evidence, the trial judge is the sole and exclusive trier of fact and judge of the credibility of witnesses, including the weight to be given their testimony. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App.1990); *Cannon v. State,* 691 S.W.2d 664 (Tex.Crim.App. 1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986); *Laca v. State,*

893 S.W.2d 171, 177 (Tex.App.—El Paso 1995, pet. ref'd); *Lee v. State*, 893 S.W.2d 80, 84 (Tex.App.—El Paso 1994, no pet.); *Chavarria v. State*, 876 S.W.2d 388, 391 (Tex. App.—El Paso 1994, no pet.). In that regard, the trial court is free to believe or disbelieve the testimony of each of the State's witnesses as well as the evidence of the accused. An appellate court must view the record evidence and all reasonable inferences therefrom in the light most favorable to the trial court's ruling. *Romero*, 800 S.W.2d at 543. We do not engage in our own factual review but merely decide whether or not the trial judge's findings of fact are supported by the record. If the findings are supported by the record, we are not at liberty to disturb them. Thus, on review, we only address the question of whether the trial court improperly applied the law to the facts. *Romero*, 800 S.W.2d at 543; *Laca*, 893 S.W.2d at 177; *Lee*, 893 S.W.2d at 84. Should the trial judge's determination be correct on any theory of law applicable to the case, it will be sustained. *Romero*, 800 S.W.2d at 543; *Laca*, 893 S.W.2d at 177; *Lee*, 893 S.W.2d at 84. This principle holds true even if the trial court gives the wrong reason for its decision, especially when the decision concerns the admission of evidence. *Romero*, 800 S.W.2d at 543; *Dugard v. State*, 688 S.W.2d 524 (Tex.Crim.App.1985).

 Critical to the determination of Appellant's contentions is whether he was in custody during his questioning. Voluntariness is only an issue if the confession was obtained when the individual was in custody at the time of the questioning. *Garza v. State*, 915 S.W.2d 204, 211 (Tex.App.—Corpus Christi 1996, pet. ref'd). A person is considered in "custody" only if a reasonable person would believe that his or her freedom of movement was restrained to the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322–24, 114 S.Ct. 1526, 1528–30, 128 L.Ed.2d 293, 298–99 (1994); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex.Crim.App.1996). The reasonable person standard presupposes an innocent person. *Id.* The subjective intent of law enforcement officials to arrest is not relevant unless that intent is communicated or otherwise manifested to the suspect. *Stansbury*,

511 U.S. at 325–26, 114 S.Ct. at 1530, 128 L.Ed.2d at 300; *Dowthitt*, 931 S.W.2d at 254

Formerly, the following four factors were utilized to determine custody:

(1) Probable cause to arrest,

(2) Subjective intent of the police,

(3) Focus of the investigation, and

(4) Subjective belief of the defendant.

*Meek v. State*, 790 S.W.2d 618, 621–22 (Tex. Crim.App.1990). Under the *Stansbury* decision, factors two and four above are irrelevant except to the extent that they are manifested in the words or actions of law enforcement officials. The determination of custody is based entirely upon objective circumstances. *Stansbury*, 511 U.S. at 322–23, 114 S.Ct. at 1528–29, 128 L.Ed.2d at 298; *Dowthitt*, 931 S.W.2d at 254. This determination is made on an ad hoc basis, after consideration of all the objective circumstances. *Id.*

 When a person is transported to a police facility by the police in the course of an investigation, if the person was acting upon the invitation, request, or even the urging of the police and there were no threats, express or implied, that he or she will be taken in a forcible manner, and the accompaniment is voluntary and consensual, then the individual is not in custody. *Anderson v. State*, 932 S.W.2d 502, 505 (Tex.Crim.App. 1996); *Shiflet v. State*, 732 S.W.2d 622, 630 (Tex.Crim.App.1985). Station house questioning does not, by itself, constitute custody. *Dowthitt*, 931 S.W.2d at 255. However, the fact that an interrogation begins as noncustodial does not prevent custody from arising later; the conduct of the police during the encounter may cause a consensual inquiry to escalate into custodial interrogation. *Id.*, *Ussery v. State*, 651 S.W.2d 767, 770 (Tex. Crim.App.1983).

 There are four general situations which may constitute custody:

(1) when the suspect is physically deprived of his or her freedom in any significant way;

(2) when a law enforcement official tells the suspect that he or she cannot leave;

(3) when law enforcement officials create a situation that would lead a reasonable person to believe there has been a significant restriction upon his or her freedom of movement; and

(4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he or she is free to leave.

*Shiflet,* 732 S.W.2d at 629. Regarding the first of the immediately above three situations, the restriction upon freedom of movement has to amount to the degree associated with an arrest as opposed to an investigative detention. *Dowthitt,* 931 S.W.2d at 255. Regarding the fourth situation, the officers' knowledge of probable cause must be manifested to the suspect. *Id.* This manifestation could occur if some information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers. Further, as probable cause is a "factor" in other cases, the fourth situation does not automatically establish custody. Custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he or she is under restraint to the degree associated with an arrest. *Id.*

A person is considered in "custody" only if a reasonable person would believe that his or her freedom of movement was restrained to the degree associated with a formal arrest. *Stansbury,* 511 U.S. at 322–24, 114 S.Ct. at 1528–29, 128 L.Ed.2d at 298–99; *Dowthitt,* 931 S.W.2d at 254. The reasonable person standard presupposes an innocent person. *Id.* The subjective intent of law enforcement officials to arrest is not relevant unless that intent is communicated or otherwise manifested to the suspect. *Stansbury,* 511 U.S. at 324–26, 114 S.Ct. at 1530, 128 L.Ed.2d at 300; *Dowthitt,* 931 S.W.2d at 254.

■ In the present case, there is evidence indicating that Appellant agreed to go to the police station with the detectives. He was never informed he was a suspect or that he was under arrest. He was never handcuffed and freely consulted with Detective Ruiz in the writing of his confession. As we find that Appellant was not in custody at the time of his interview, we overrule Points of Error Nos. One and Four.

In Point of Error No. Five, Appellant argues that the court erred in failing to provide written findings of fact and conclusions of law. Pursuant to order of this Court, these findings were provided by the trial court prior to the consideration of this appeal. Point of Error No. Five is overruled.

■ In Appellant's sixth point of error, he maintains that the court erred in denying his motion to suppress because of his request for counsel. With regard to this issue, we find conflicting testimony as to whether or not Appellant invoked his right to counsel. As such, this appellate court is obligated to adhere to the trial court's determination that Appellant failed to invoke his right to counsel. *See Stiles v. State,* 927 S.W.2d 723, 731 (Tex.App.—Waco 1996, no pet.). Point of Error No. Six is overruled.

■ In Point of Error No. Nine, Appellant asserts that the court erred by allowing the State to introduce the victim's family members to the venire during voir dire. During voir dire, the prosecutor asked permission of the court to introduce members of the victim's family to the jury venire. The trial court limited the prosecutor to bringing in the "potential" witnesses and asking the jurors if they knew the potential witnesses by name or appearance—but not to disclose their relationship to the victim. The prosecutor introduced Larry and Brent Hahn, the victim's family members, to the jury. These men did not testify at trial.

This procedure is within the sound discretion of the trial court and only an abuse of discretion will result in reversal. *Clark v. State,* 608 S.W.2d 667, 669 (Tex.Crim.App. 1980). We find that the court did not abuse its discretion in allowing the jury venire to view the potential witnesses. Point of Error No. Nine is overruled.

■ In Point of Error Nos. Ten A, B, and C, Appellant contends that the court erred in allowing evidence of extraneous offenses of abuse of Appellant's ex-wife, dismemberment of his wife's corpse, and failure to give prior notice of these extraneous offenses. Regarding the issue of spousal

abuse, the Appellant's defensive posture at trial was that his wife was the first aggressor. He also elicited evidence from other witnesses that portrayed Appellant as the victim of spousal abuse. In such instances, the State is entitled to introduce rebuttal evidence of prior violent acts by the accused to show his intent. *Halliburton v. State*, 528 S.W.2d 216, 219 (Tex.Crim.App.1975); *Robinson v. State*, 844 S.W.2d 925, 929 (Tex. App.—Houston [1st Dist.] 1992, no pet.).

█ Regarding the dismemberment evidence, we find such evidence admissible to show consciousness of guilt and an accused's overall mental state. *Lee v. State*, 866 S.W.2d 298, 302 (Tex.App.—Fort Worth 1993, pet ref'd). As Appellant's actions had a bearing on his attempt to conceal the body and his consciousness of guilt, we find that the court did not err in admitting the evidence.

Regarding the lack of notice, Appellant did not object to the failure to notify at trial. Accordingly, his complaint is waived. *See Brown v. State*, 880 S.W.2d 249, 252 (Tex. App.—El Paso 1994, no pet.). Point of Error No. Ten is overruled in its entirety.

█ In Point of Error No. Eleven, Appellant maintains that the court erred in allowing gruesome photographs into evidence. Appellant complains of State's exhibits numbers 7 and 130. Exhibit 7 shows the severed head of the victim and exhibit 130 shows the torso of the victim. The admission of photographs is within the discretion of the trial court. *Long v. State*, 823 S.W.2d 259, 270 (Tex.Crim.App.1991). Only where the probative value of the photograph is small, and the inflammatory potential is great, will it be an abuse of discretion to admit the photograph. *Id.*, at 274–75. Photographs showing a victim's wounds are admissible when offered to clarify and support observations and conclusions about the victim's injuries and to reveal the manner of death as alleged in the indictment, and not solely to inflame the minds of jurors. *Madden v. State*, 799 S.W.2d 683, 697 (Tex.Crim.App. 1990). In the present case, these photos were utilized to illustrate the medical examiner's testimony and to demonstrate Appellant's attempts to conceal the identity of the deceased. We find that the court did not abuse its discretion in admitting the two photos. Point of Error No. Eleven is overruled.

█ In Point of Error No. Twelve, Appellant maintains that he was deprived of effective assistance of counsel. Successful claims of ineffective assistance of counsel must first demonstrate that counsel was not functioning as counsel guaranteed by the Sixth Amendment in providing reasonably effective assistance. *Strickland v. Washington*, 466 U.S. 668, 687, 693, 104 S.Ct. 2052, 2064, 2067–68, 80 L.Ed.2d 674 (1984). The second prong of this test requires a showing that counsel's errors were so serious as to deprive Appellant of a fair trial, such that there arises a reasonable probability that but for counsel's unprofessional errors, the results would have been different. Reasonable probability is a likelihood sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2052, 80 L.Ed.2d at 698. Texas adopted this test in *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex.Crim.App. 1986). *See also McFarland v. State*, 845 S.W.2d 824, 842 (Tex.Crim.App.1992), *cert. denied*, 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993). The constitutional right to counsel does not mean errorless representation. In order to meet the constitutional standard, counsel must provide reasonably effective assistance. *Wilkerson*, 726 S.W.2d at 548. In reviewing these assertions, the totality of representation is examined as opposed to focusing upon isolated acts or omissions. Ineffective assistance of counsel cannot be established by isolating or separating out one portion of the trial counsel's performance for examination. *Bridge v. State*, 726 S.W.2d 558, 571 (Tex.Crim.App.1986). In that regard, this Court, on review, will not engage in hindsighted comparisons of how other counsel, in particular, appellate counsel, might have tried the case. *See Wilkerson*, 726 S.W.2d at 548. A fair assessment of trial counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances at trial, and to evaluate the conduct from counsel's perspective at the time. *Stafford v. State*, 813 S.W.2d 503, 506 (Tex.

Crim.App.1991). We must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance. The Appellant must overcome the presumption that under the circumstances at trial, the challenged action could be considered sound trial strategy. *Strickland,* 466 U.S. at 688–89, 104 S.Ct. at 2052, 80 L.Ed.2d at 693–95; *Stafford,* 813 S.W.2d at 506. Consequently, allegations of ineffectiveness of counsel must be firmly founded by the record. *Hawkins v. State,* 660 S.W.2d 65, 75 (Tex.Crim.App.1983); *Mercado v. State,* 615 S.W.2d 225, 228 (Tex.Crim.App.1981). The burden is upon Appellant to establish ineffective assistance of counsel by a preponderance of the evidence. *Williams v. State,* 837 S.W.2d 759, 761 (Tex.App.1992).

 During voir dire, the prosecutor stated that a jury can convict based solely on an accused's confession. Appellant contends that trial counsel failed to object to this misstatement of the law which constitutes ineffective assistance of counsel. We fail to see how this statement could have prejudiced Appellant as he did not contend at trial that he did not kill the deceased. As such, it was never an issue at trial.

 Appellant next asserts that trial counsel failed to object to an objectionable juror. However, this juror stated that he could be fair and impartial. Accordingly, there was no basis to exclude the juror.

Appellant complains of trial counsel's failure to request a limiting instruction when evidence of extraneous offenses was admitted. However, it is valid trial strategy not to request such an instruction as it can serve to accentuate the extraneous offenses as opposed to limiting them. *See Curry v. State,* 861 S.W.2d 479, 484–85 (Tex.App.—Fort Worth 1993, pet. ref'd).

 Appellant points to trial counsel's failure to pursue an insanity defense as indicating ineffectiveness of counsel. There is no evidence in the record before us that such a defense was available. Accordingly, Point of Error No. Twelve is overruled in its entirety.

In Point of Error No. Thirteen, Appellant maintains that the court abused its discretion in failing to allow him to ask specific instanc-es of misconduct from his reputation witness after that witness had been impeached. Appellant has failed to preserve error in that he failed to make an offer of proof regarding what the witness would have testified to. *Love v. State,* 861 S.W.2d 899, 901 (Tex.Crim. App.1993). Point of Error No. Thirteen is overruled.

In Point of Error No. Fifteen, Appellant maintains that the arrest warrant did not state probable cause to arrest. As we have determined that Appellant was not under arrest and the warrant was never executed, we find it unnecessary to respond to this contention. Furthermore, Appellant failed to object to the consent to search the residence. Accordingly, we overrule Point of Error No. Fifteen.

Having overruled each of Appellant's points of error, we affirm the judgment of the trial court.