COURT OF APPEALS









COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS

 


 
 
  
 DENNIS LEE ALLEN,
  
                             Appellant,
  
 v.
  
 THE STATE OF TEXAS,
  
                             Appellee.
 
 
  
 '
    
 '
    
 '
    
 '
    
 '
    
  ' 
  
 
 
  
  
                 No. 08-00-00442-CR
  
 Appeal from the
  
 265th District Court
  
 of Dallas County, Texas 
  
 (TC# F-0001305-TR) 
  
 
 


 

O P I N I O N

 

Dennis Lee Allen appeals his
conviction for capital murder with punishment assessed at life in the
penitentiary.  We affirm.

Facts

Because appellant Allen challenges
the legal and factual sufficiency of the evidence to support his conviction, we
will examine the facts adduced at trial in detail.

Jesse Borns was a 70 year old man who
owned a leather shop and storefront ministry in Dallas, near the intersection
of Martin Luther King Boulevard and Colonial Boulevard.  He was also licensed as an agent to sell
pagers and mobile phones.








His wife, Marjorie Borns, testified
that on April 6, 1999, Reverend Borns planned to give an evening seminar, and
she did not expect him home until late. 
She spoke with him on the telephone around 5 p.m.  She became concerned when he did not return
home that night.  At 6 a.m., she and a
neighbor drove to his storefront, found the lights on, the door unlocked, and
his van outside.  They found Borns=s body in the storefront.  He had been stabbed numerous times and items
had been taken from the shop.

Ms. Borns also testified that her
husband had several credit cards.  Lists
of his credit cards in his handwriting were admitted in evidence.  None of his credit cards were ever recovered,
nor were they found on his body.  Ms.
Borns also identified an invoice and tax exemption form from Teletouch beepers,
bearing her husband=s signature.  Defense
counsel cross-examined Ms. Borns extensively about trouble her husband had
experienced many years before with a Baptist congregation.

Mike Epple, an officer with the
Dallas Police Department physical evidence section, testified about the crime
scene.  Among other things, he identified
numerous photographs.  He testified that
he was not able to make any identifications through fingerprints.  He testified that because of information
received, officers had returned to the scene on July 12, 2000, and searched the
building=s roof.  They found a knife, which they photographed
then sent to the lab for analysis, but no other useful evidence was found on
the weapon.








Judy Hobbs is a resale manager for
Teletouch Communications.  She sells air
time and pagers to retail resalers.  She
identified Jesse Borns as an agent she had enrolled to sell pagers and air
time.  She identified State=s Exhibit 67 as a pager she had sold
to Mr. Borns on April 6, 1999.  She was
contacted by the police regarding the pagers she had sold to Mr. Borns, and she
notified the police when someone attempted to activate one of them.

Kenneth Jones owns a pet shop on
Colonial Boulevard in Dallas, where he also buys and sells used pagers.  In April 1999, he purchased a pager from a
man he identified as the defendant, Dennis Allen.  Allen was with another man, and Jones did not
let them into his store because they both looked Ahulled out,@ not an unusual thing in the
area.  Jones paid $15 for the pager; he
normally pays $10, but this one was new and still in its box.  When Jones attempted to activate the pager,
he was visited by the police, who told him its owner had been murdered.  At the time Jones testified, he was on
probation in Kaufman County for a drug offense.

Edna Blackman manages a gas station
in South Dallas.  She identified a credit
card transaction that took place on April 7, 1999 sometime between 4 p.m. and
midnight.  The credit card used matched
the number on Mr. Borns=s list of credit cards.








Samson Tinsaye works in an EZ Mart
convenience store.  At 1:30 a.m. on April
8, 1999, he processed a credit card transaction for $32.09.  The credit card=s last four digits were the same as
Borns=s Capital One card.  Tinsaye identified Allen as the person who
had used the card, and he had identified him from a photo lineup earlier in the
investigation.  Tinsaye=s identification was undermined
during defense counsel=s cross- examination, but the prosecutor established that the
photo he had identified in July 1999 was Allen.

Alvin DeGrafton-Reid testified that
on April 6, 1999, he was working construction at a friend=s beauty salon next door to Reverend
Borns=s shop.  He was on the corner around 5 p.m. when he
saw a young man came up to Borns and ask for a job.  Borns told him to clean himself up, get off
drink and drugs, and come back to see him. 
The man then got fidgety and agitated. 
The agitated man was accompanied by another man, whom DeGrafton-Reid
identified as Allen.

Charles Manning testified he is a
news photographer for NBC.  In April
1999, however, he was a crack addict living on the streets of Dallas, which is
how he met Reverend Borns.  He also identified
Allen as someone he knew from the streets, where his nickname is AD.A.@ 
D.A.=s girlfriend is a woman named
Felicia, who he also knew from the streets because, A[w]e all hung out in the same
area.  We all knew each other because we
all used . . . .@  Manning identified
Felicia and a AStan@ from their photographs.  D.A., Felicia, and Stan all hung out together
in the neighborhood.








Cynthia Sloan testified that she is a
prostitute and a crack abuser who spends time hanging out at Martin Luther King
Boulevard and Colonial.  At the time of
her testimony, she was in jail.  She
knows D.A. and Stan Mozee.  She was in a motel
room with the two when she heard Allen say to Mozee, AWhy you have to go there?  That shit wasn=t cool.@ 
Mozee responded by telling D.A. to shut up, Aeverybody business wasn=t nobody business.@ 
She later learned that Borns had been murdered.  After learning this, she had a conversation
with Allen, who told her it wasn=t supposed to have happened like that,
but shit went bad.  Allen told her he had
tried to stop Stan, but had gotten cut himself. 
The old man wasn=t supposed to die. 
Allen also told Sloan they had been watching Borns for a couple of
weeks, with the intent of robbing him.

Lionel Hardemon testified that he
knew defendant Allen.  On May 28, 1999,
they had a conversation in which Allen told him he had done some things and he
needed to talk to someone.  Allen told
him he had hurt someone and didn=t mean it.  He had stabbed someone and taken money,
credit cards, and a pager.  Hardemon has
a long history of trouble with the law.








John Paul Robinson testified that he
was in jail at the time of his testimony, and had been in jail earlier when he
had shared a tank with defendant Allen. 
He also knew Allen from when Robinson was working at a club on Martin
Luther King Boulevard.  In June 1999, he
saw Allen at the club and bought from him a cellular telephone, a beeper, and a
radio.  The phone was not working, and
Allen told him not to take it to anyone he did not trust.  He saw Allen a couple of days later, and
asked him about the phone.  Allen told
Robinson, Asome stuff had happened real crazy.@ 
Allen and another man had gone to make some money and things went wrong,
the other guy messed up because he was a dope fiend.  They Awent to make a lick@ in other words, commit a
robbery.  Because the dope fiend had
messed up, someone had been badly hurt. 
The dope fiend stabbed the robbery victim.  Although Allen and his girlfriend had been
outside, they heard screaming, Allen went in, and there he saw the other man
stabbing the victim in the upper body.

The next time Robinson saw Allen,
they were both in jail.  There, Allen
confessed that the things he had described the dope fiend as doing, Allen had
actually done himself.  Allen told
Robinson he went in alone and demanded the preacher give him his stuff, but the
preacher did not seem upset or to take him seriously.  Allen was on drugs at the time. Allen told
the preacher if he did not cooperate he would make him feel the blade, so he
stuck him once and from there he Ajust went off.@ 
His girlfriend came in at that point and panicked, which caused the
preacher to put up a fight.  They looked
around for things to take, and found a phone, beepers, and other items.  The weapon Allen described to Robinson was
not knife, but a letter opener or some kind of tool.  Allen threw it on the roof.  Allen also told him he had run into the other
man involved, and had persuaded him to write a statement that Allen was not
involved.  Allen had also gotten some
other inmates to witness the statement and sign statements that the other man
had been acting on his own volition.








Detective Rick Berry of the Dallas
Police Department homicide unit testified about his investigation of the Jesse
Borns murder.  He learned that credit
cards, a cellular phone, and a box of pagers were missing.  After following a number of dead-end leads,
he was notified that someone had attempted to activate one of the missing
pagers.  The pager was recovered from
Jones, who identified Allen as the one who had sold it to him.  He also followed up on the credit card
transaction at the Shell station and the EZ Mart transaction.  At the time, however, he had no photographs
of Dennis Allen to show witnesses, as Allen had not surfaced as a suspect.  After interviewing Charles Manning and
Michael Morris, Berry focused his investigation on Stan Mozee and Dennis
Allen.  Jones then identified Allen as
the man who had sold him the pager. 
Jones could not identify Mozee. 
Berry arrested both Allen and Mozee as a result.  He later talked with Lionel Hardemon and John
Robinson, both of whom gave information implicating Allen and Mozee as Borns=s killers.

Bill Watson, a forensic scientist
with Gene Screen, testified that he had received blood samples from the crime
scene and he was unable to make a definitive identification.  He was able to identify Borns=s blood, which was mixed with that of
an unknown individual.

The State introduced Stan Mozee=s statement over objection.  It read:








The day
before the crime in question, I was approached by Felicia and D.A. about
hitting a lick for tomorrow night, and they asked if I would be a watchout for
them, and I said, >yes, tell me what it is.=  They said it was to rob the old man next to
the beauty shop.  The next day at about
9:30 p.m., we met at the Royal Palace, and we walked up Colonial up to the
leather shop next to the beauty shop. 
D.A. went in first, then me, then Felicia.  D.A. went in the office as me and Felicia
watched out from the inside.  D.A asked
the Reverend for his wallet, then I heard D.A. say, >where the money?=  The Reverend told him >I don=t have any money.=  That=s when
D.A. said, >You got it old man, you keep money.=  D.A. said >you pissing me off.=  That=s when I
heard the old man yell >oh.=  D.A. hit him a
couple of times.  After I heard the old
man yell, that=s when I stepped outside the door.  Then about a minute later, Felicia stepped
outside the door.  We could see D.A.
dragging the old man towards the back. 
Then D.A. came outside and we went back to the vacant apartments.  D.A. had a box of beepers and a cellular
phone.  D.A. went over to a club to sell
the cellular phone, and came back with $50.00. 
Then he went to score a quarter, and we went to get a two hour room at
the Windway.  Then he broke me off half
of it and he told me to tear my ass and keep my mouth shut.

 

Joni McClain is the Dallas County
medical examiner.  She testified that she
had autopsied Borns=s body, that he had received 47 sharp force wounds, and it
was her conclusion that he had died of these multiple sharp force
injuries.  She testified that such a
large number of wounds indicates a specific intent to kill the victim.

The defense called defendant Dennis
Lee Allen.  He testified that he was a
crack addict who sometimes lived on the street and sometimes with his
mother.  He had cooperated fully with the
police when they had questioned him about the murder, volunteering information
about a group of young men causing a disturbance in the area that night.  Allen testified he never told anyone he
killed Borns.  He had used drugs that
day.  He had always been confident about
volunteering fingerprint and DNA evidence, as he knew he was innocent.  The defense vigorously cross-examined Berry
on a number of topics, including the lack of DNA evidence.








The defense used the prior testimony
of Stan Mozee.  Mozee testified a
homeless man had told him about Borns being killed.  He found out about the beepers being taken
from the shop when he was interviewed by Detective Berry.  The second time Berry interrogated him, he
told Mozee that Allen was implicating Mozee in the stabbing.  Mozee was intoxicated at the time, off his
medications, and scared of receiving the death penalty.  That is why he gave a statement to Berry
implicating himself and Allen.  He had
concocted the statement about Felicia and D.A. approaching him to Ahit a lick.@ 
Likewise, he made up the part about going to the shop, stating, AI only implicated Dennis Allen saying
that he stabbed the pastor because I believed what Officer Berry had told me
that Dennis Allen said I stabbed the pastor, so I just switched it around.@ 
Mozee testified he is bipolar, and at the time he made the statement, he
had been off his medication.

Ray Junior Turner and Tyrone Lamont
Parnell both testified they had been in jail in the same tank with Mozee and
Allen when Mozee wrote out his statement that he had made up the story about he
and Allen killing Borns.  They both
signed statements witnessing Mozee=s retraction.

Legal
and factual sufficiency of the evidence

In his first issue on appeal, Allen
challenges the factual sufficiency of the evidence to show that he caused Jesse
Borns=s death.  In his second issue on appeal, he challenges
the legal sufficiency of the evidence to show that, alone or as part of a
conspiracy, he caused the death.  As
these claims both entail a review of the evidence, we address them together.

Standards of review








We review factual sufficiency of the
evidence to support a verdict by viewing all the evidence in a neutral light,
reversing only if the proof of guilt is so obviously weak as to undermine our
confidence in the jury=s determination, or the proof of guilt, although adequate if
taken alone, is greatly outweighed by contrary proof.  Johnson v. State, 23 S.W.3d 1, 11
(Tex. Crim. App. 2000); Clewis v. State, 922 S.W.2d 126, 129 (Tex.
Crim.  App. 1996); Drost v. State, 47
S.W.3d 41, 45 (Tex. App.--El Paso 2001, pet. ref=d). 
In conducting a factual sufficiency review, we do not substitute our
conclusions for those of the fact finder. 
Duffy v. State, 33 S.W.3d 17, 22 (Tex. App.--El Paso 2000, no
pet.).  It is not within our province to
interfere with the fact finder=s resolution of conflicts in the evidence or generally to
pass on the weight or credibility of a witness=s testimony.  Id.

Only those few matters bearing on
credibility that can be fully determined from a cold appellate record may be
reviewed.  Johnson, 23 S.W.3d at
8.  However, unless the record clearly
reveals a different result is appropriate, we must defer to the jury=s determination concerning the weight
given to contradictory testimonial evidence. 
Id.  We have authority to
disagree with the fact finder=s determination only when the record clearly indicates such a
step is necessary to prevent manifest injustice.  Johnson, 23 S.W.3d at 9.








In reviewing the legal sufficiency of
the evidence to support a criminal conviction, we view all the evidence
presented by both the prosecution and defense, in the light most favorable to
the verdict to determine whether any rational trier of fact could have found
the essential elements of the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); Duffy, 33
S.W.3d at 22.  We do not resolve any
conflict of fact or assign credibility to the witnesses.  Adelman v. State, 828 S.W.2d 418, 423
(Tex. Crim. App. 1992); Duffy, 33 S.W.3d at 22.  All inconsistencies in the evidence are
resolved in favor of the verdict.  Matson
v. State, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991); Duffy, 33
S.W.3d at 22.

Sufficiency of the evidence to show Allen caused Borns=s death








In claiming factual insufficiency,
Allen relies upon the scientific evidence, specifically the lack of any DNA or
fingerprint evidence linking him to the scene of Reverend Borns=s death, and evidence that the blood
analysis indicated a mixture of Borns=s blood with another unknown human,
not Allen.  The case against Allen,
however, was not built on DNA or fingerprint evidence.  Rather, the evidence supporting  Allen=s conviction consisted of the sale of
Borns=s pager, cellular phone, beeper, and
use of his credit cards, all of which were linked to Allen.  Additionally, a witness identified Allen as
having been with another man who had behaved aggressively toward Borns shortly
before his killing.  Other witnesses
testified that Allen told them about a robbery he was involved in that had gone
bad, that Athe old man wasn=t supposed to die,@ that he had obtained the phone in a
robbery where someone had been stabbed, that Allen himself had done the
stabbing, and that he had thrown the stabbing implement on the roof.  A knife was later recovered from the roof of
Reverend Borns=s building.  In this case, we cannot say that proof of
guilt is so obviously weak as to undermine our confidence in the jury=s determination, or that proof of
guilt, although adequate if taken alone, is greatly outweighed by contrary
proof.  Allen=s first issue is overruled.

Similarly, in complaining of legal
insufficiency, Allen cites the lack of scientific evidence, the presence of an
unknown individual=s blood mixed with Borns=s, and Detective Berry=s alleged coersion in obtaining Mozee=s statement incriminating Allen.  We conclude that a rational trier of fact
could easily find beyond a reasonable doubt that Allen had committed the
offense of capital murder.  Allen=s second issue on appeal is
overruled.

Ineffective
assistance of counsel

In his third issue on appeal, Allen
urges that trial counsel was ineffective because he failed to interview,
subpoena, and call certain witnesses.

Standard of review








In reviewing claims of ineffective
assistance of counsel, we adhere to the test set out in Strickland v.
Washington, 466 U.S. 668, 687-93, 104 S.Ct. 2052, 2064-68, 80 L.Ed.2d 674
(1984).  This requires a twofold
showing:  (1) that counsel=s representation  fell below an objective standard of
reasonableness; and (2) there is a reasonable probability that but for counsel=s unprofessional errors, the result
of the proceeding would have been different. 
Id. at 694, 104 S.Ct. at 2068. 
Reasonable probability is a likelihood sufficient to undermine our
confidence in the outcome.  Id.  This does not mean the defendant is
entitled to errorless representation, but rather that counsel must provide
reasonably effective assistance.  Wilkerson
v. State, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986).  We examine the totality of representation as
opposed to focusing upon isolated acts or omissions.  Ineffective assistance of counsel cannot be
established by isolating or separating out one portion of trial counsel=s performance for examination.  Bridge v. State, 726 S.W.2d 558, 571
(Tex. Crim. App. 1986).  We do not engage
in hindsighted comparisons of how other counsel, in particular appellate
counsel, might have tried the case.  Bradley
v. State, 960 S.W.2d 791, 803 (Tex. App.--El Paso 1997, pet. ref=d). 
We indulge a strong presumption that counsel=s conduct falls within the wide range
of reasonably professional assistance. 
Defendant must overcome the presumption that under the circumstances,
the challenged action could be considered sound trial strategy.  Allegations of ineffective assistance of
counsel must be firmly founded in the record. 
Id. at 804.

Failure to interview and subpoena witnesses








Here, Allen complains of trial
counsel=s failure to interview, subpoena, or
call as witnesses two individuals: 
Derrick Lewis and Audric Gibson. 
Lewis was a suspect early in the investigation, who was implicated in
the crime by Gibson.  These details of
the investigation were related to the jury by Detective Berry, as well as the
reason he eliminated Lewis as a suspect: 
A[W]hat I found out in the course of
that investigation was that Derrick Lewis was currently dating Audric Gibson=s former girlfriend.  Found many reports where he violated the
protective orders, things like that against his girlfriend.  And this was a clear case of he was trying to
get her current boyfriend Derrick Lewis in trouble.@ 


Lewis was one of several persons who
were investigated by Detective Berry before he focused upon Allen and Mozee as
suspects.  Allen does not explain how
Lewis=s testimony would have cast doubt
upon the case against Allen, nor does his assertion that trial counsel failed
to investigate or interview Lewis or Gibson find any support in the record,
which is silent on this issue.  Allen
presents nothing to overcome our presumption that the decision not to call
Lewis or Gibson was sound trial strategy. 
Moreover, counsel cross-examined Detective Berry on his failure to obtain
and compare Lewis=s blood with evidence found at the crime scene. During his
thorough cross-examination of the detective, counsel had the officer write out
for the jury all the things he did not do in investigating potential suspects
other than Allen.  We have reviewed the
record as a whole and conclude trial counsel=s representation fell well within the
objective standard of reasonableness required by Strickland.  Counsel engaged the State=s witnesses in vigorous
cross-examination, he effectively challenged shaky witness identification, he
displayed a good grasp of the facts and law, he objected appropriately and
preserved error properly.  We find
nothing to support Allen=s claim of ineffective assistance.  His third issue on appeal is overruled.

Admitting the codefendant=s confession








In his fourth issue on appeal, Allen
contends that the trial court erred in admitting the statement of his
codefendant, Stan Mozee.

Standard of review

We review questions involving
admission of evidence under the abuse of discretion standard.  Green v. State, 934 S.W.2d 92, 101-02
(Tex. Crim. App. 1996); Smith v. State, 12 S.W.3d 149, 150 (Tex.
App.--El Paso 2000, pet. ref=d).  We will not
reverse a trial judge whose ruling was within the zone of reasonable
disagreement.  Green, 934 S.W.2d
at 102.

Mozee=s statement

Allen=s codefendant Mozee made a detailed
statement to Detective Berry about the circumstances of Borns=s killing.  Although an out-of-court statement by a
codefendant is hearsay, it is admissible as a statement against interest when:

A
statement which was at the time of its making so far contrary to the declarant=s pecuniary or proprietary interest, or so far tended
to subject the declarant to civil or criminal liability, or to render invalid a
claim by the declarant against another, or to make the declarant an object of
hatred, ridicule, or disgrace, that a reasonable person in declarant=s position would not have made the statement unless
believing it to be true.  In criminal
cases, a statement tending to expose the declarant to criminal liability is not
admissible unless corroborating circumstances clearly indicate the
trustworthiness of the statement.  Tex. R. Evid. 803(24).

 








Even where a narrative is generally self-inculpatory,
however, the hearsay exception does not extend to statements contained within
it that are not self-inculpatory.  Miles
v. State, 918 S.W.2d 511, 515 (Tex. Crim. App. 1996) (quoting Williamson
v. United States, 512 U.S. 594, 600-01, 114 S.Ct. 2431, 2435, 129 L.Ed.2d
476 (1994)); Zarychta v. State, 961 S.W.2d 455, 458 (Tex. App.--Houston
[1st Dist.] 1997, pet. ref=d).  The confession of
a codefendant may be admissible if it is truly self-inculpatory, rather than
merely an attempt to shift blame or curry favor with authorities.  Zarychta, 961 S.W.2d 458.  Whether a statement is self-inculpatory can
only be determined by viewing it in context. 
Id. (quoting Lee v. Illinois, 476 U.S. 530, 545, 106 S.Ct.
2056, 2064, 90 L.Ed.2d 514 (1986)).  A
codefendant=s confession is presumptively
unreliable as to those portions which detail a codefendant=s conduct or culpability because
those portions may be the result of a desire to shift blame, curry favor, get
revenge, or divert attention.  Id.
at 458-59.  A codefendant=s statements about this defendant are
less credible than ordinary hearsay evidence. 
Id.  Nevertheless, such
hearsay statements may be admissible if sufficient corroborating facts assure
that it is not a fabrication.  Cofield
v. State, 891 S.W.2d 952, 955-56 (Tex. Crim. App. 1994); Holiday v.
State, 14 S.W.3d 784, 787 (Tex. App.--Houston [1st Dist.] 2000, pet. ref=d). 
Factors which may constitute sufficient corroboration include
whether:  (1) the guilt of the declarant
is inconsistent with guilt of the accused; (2) the declarant may have committed
the crime; (3) the time and spontaneity of the statement; (4) the party to whom
the declaration was made; and (5) the independent, corroborating facts.  Holiday, 14 S.W.3d at 787.








Rather than contending the statement
meets reliability requirements sufficient to exempt it from the hearsay rule,
the State contends instead that Mozee=s statement was properly admitted,
not for the truth of the statements contained in it, but as rebuttal to defense
counsel=s cross-examination concerning
Detective Berry=s investigation of the crime. 
The problem with this theory is that nothing in the record supports
it.  The statement was admitted during
the State=s case-in-chief, during redirect
examination of Detective Berry.  The
prosecutor asked Berry why he had eliminated various other individuals as
suspects, AWhat information did you have to
prove that?@ 
The detective responded he had, A[t]he information that proved that
Dennis Allen and Stan Mozee were the suspects in this case.@ 
The prosecutor then detailed the course of Berry=s investigation of Allen, leading to
the following exchange:

Q:        Did you
also talk to and interview Stan Mozee?

 

A:        Yes, I
did.

 

.   .   .

 

Q:        Sir, I=m going to hand you a two-page statement marked State=s Exhibit No. 112. 
Do you recognize that?

 

A:        Yes, I
do.

 

Q:        What is
it?

 

A:        This is
a voluntary statement that Stan Mozee gave regarding his participation and
Dennis Allen=s in this offense.

 

Defense
Counsel:  Okay.  And Your Honor, once again we=ll object to that based on the fact that it denies us
the right to confront and cross-examine any witnesses concerning this
statement, it is hearsay, and it=s
inadmissible against my client.

 

The
Court:  Overrule the objections.

 

Q:        Is this
a copy of that statement?








A:        Yes, it
is.

 

Q:        True
and accurate copy?

 

A:        Yes, it
is.

 

Prosecutor:  Your Honor, at this time I=ll offer State=s
Exhibit No. 112 into evidence, and tender to opposing counsel.

 

Defense
Counsel:  We object for all the same
purposes, Your Honor.

 

The
Court:  I=ll have
to overrule your objection.  It will be
admitted.

 

Shortly thereafter, Detective Berry read Mozee=s entire statement to the jury.  This all occurred before the defense
presented any evidence.  Nothing in the
record indicates the State was proffering the statement for anything other than
its truth, and Berry=s statement that his information proved that Allen and
Mozee were the perpetrators underscores the point.  The State referred to the statement during
closing argument as evidence of Allen=s guilt.  We cannot accept the State=s contention that Mozee=s statement was not hearsay because
it was admitted only to rebut cross-examination about the thoroughness of
Detective Berry=s investigation.  We
therefore must determine:  (1) whether
Mozee=s statement is self-inculpatory and
therefore reliable for that reason; and (2) whether it is sufficiently
corroborated to otherwise indicate reliability.








Examining Mozee=s statement, we first acknowledge
that little in it is self-inculpatory; rather, its apparent purpose was to
shift as much blame as possible to Allen. 
According to Mozee, it was Allen who recruited him to Ahit a lick,@ it was Allen who entered the store,
demanded money, lost his temper, stabbed the victim, dragged the body to the
back, stole the phones and beepers, sold the stolen property, and used the
ill-gotten money to buy drugs.  In Mozee=s statement, he did nothing but serve
as Awatchout@ and accept some drugs that were
purchased with money obtained from the robbery. 
This is exactly the type of statement that we are instructed to treat
most warily, as we must assume it is made with self-serving motives and is the
least reliable kind of hearsay.

We next examine the Cofield
factors for determining reliability. 
First, although Allen=s culpability as the one who actually stabbed Borns is
inconsistent with Mozee being the stabber, their mutual guilt in these
circumstances is not inconsistent. 
Whether Mozee may have known this or not, however, is not contained in
the record.  This factor might help
establish corroboration, but not strongly. 
Second, Mozee may have been the one who stabbed Borns, so this factor
cannot support corroboration.  Third, the
time and spontaneity of the statement and the party to whom it was made do not
support corroboration.  The statement was
made long after the offense, to a police detective, as the result of an
interrogation.  Fourth, in contrast,
Mozee=s statement finds almost complete
corroboration in Robinson=s and Sloan=s testimony regarding Allen=s statements to each of them, on
independent occasions, about what had happened during the robbery.   Finally, we must note that while Mozee was
never present for purposes of confrontation and cross-examination at this
trial, the defense had the opportunity to present extensive testimony from him
in which he explained and recanted the statements at issue.








Considering the highly self-serving
content of Mozee=s statement, together with the time and circumstances of its
making, we cannot say that other corroborative factors are sufficient to make
it reliable.  We therefore conclude that
the trial court erred in admitting Stan Mozee=s hearsay statement, and proceed to a
harm analysis.

Harm

Under Tex. R. App. P. 44.2, we cannot reverse a criminal case
without finding harm.  If the error is of
constitutional dimension, we must reverse the conviction unless we determine
beyond a reasonable doubt that the error did not contribute to the
conviction.  Tex. R. App. P. 44.2(a). 
Otherwise, we reverse only if the error affected defendant=s substantial rights.  Tex.
R. App. P. 44.2(b).  Allen=s objection here is to the admission
of hearsay evidence, and he makes no claim of constitutional error.  We therefore apply a Rule 44.2(b) harm
analysis.  Under Rule 44.2(b), we will
not overturn a criminal conviction if, after examining the record as a whole,
we have fair assurance that the error did not influence the jury, or had but
slight effect.  Muhammad v. State, 46
S.W.3d 493, 509 (Tex. App.--El Paso 2001, no pet.).  Using this standard, the burden is on the
defendant to show actual harm.  Sanford
v. State, 21 S.W.3d 337, 345 (Tex. App.--El Paso 2000, no pet.).








Viewing the record as a whole, we
conclude that the trial court=s erroneous admission of Mozee=s statement did not influence the
jury, or had but slight effect.  We are
led to this decision by the following considerations.  First, 
Mozee=s statement was cumulative of
evidence given by Robinson and Sloan, both of whom testified that Allen gave a
version of events similar to that contained in Mozee=s statement.  Second, after the State presented Mozee=s statement to the jury, the defense
presented Mozee=s entire testimony from his own trial, in which he recanted
his statement, explained that he gave it in an effort to please Detective Berry
and thus avoid Athe needle,@ that he was off his medications for bipolar disorder when he
gave the statement, and that he only implicated Allen because Berry lied to him
by saying Allen had implicated Mozee. 
Thus, the defense was not hindered in presenting its position on Mozee=s truthfulness and motivations to the
jury.  For these reasons, although we
conclude admitting the hearsay statement was error, we also conclude it did not
affect substantial rights.  Allen=s fourth issue on appeal is
overruled.

Sustaining the State=s objection that argument was outside
the record

In his fifth issue on appeal, Allen
claims the trial court erred in sustaining an objection to defense counsel=s jury argument that his client had
consistently maintained his innocence, and that the physical tests would show
it.  The State objected that this was
outside the record, and the trial court agreed.








Proper jury argument is that which
may be characterized as:  (1) a summary
of the evidence; (2) reasonable deductions from the evidence; (3) a response to
argument of opposing counsel; or (4) a plea for law enforcement.  Calderon v. State, 847 S.W.2d 377,
382-83 (Tex. App.--El Paso 1993, pet. ref=d). 
The issue here is unusual in that Allen=s claim is not that the prosecutor
made improper argument, but rather that the court improperly sustained an
objection to proper argument by defense counsel.  Generally, the standard for reversing for
improper argument is whether it was extreme, improper, violative of a mandatory
statute, or injected harmful new facts.  Id.
at 383.  Similarly, if the trial court
erroneously excluded proper argument that effectively prevented the defense
from presenting its theory of the case to the jury, we think reversal
appropriate.

Defense argument

At the end of his presentation to the
jury, defense counsel argued:

Defense
Counsel:  Not one thing fits in this
case, folks.  Because you know why?  This man right here has sat in jail from I
don=t think how long innocent.  And he=s sat
there and he=s told [his] lawyer well, what about physical
testings?  The fingerprints should show
it.  Doesn=t it,
Mr. Oatman?  Doesn=t it show I=m not
guilty?

 

Prosecutor:  Your Honor, I=m going
to object.   This is outside the record.

 

The
Court:  Sustain the objection.

 

Prosecutor:  Ask counsel to refrain.

 

The
Court:  Please remain within the record.

 








In contending this argument was supported by the evidence,
Allen points to his own testimony, where he related that he had been telling
his counsel from the beginning that he had not done this, that he had assured
counsel the DNA analysis would be in his favor, that he had never been in Borns=s place of business, and AI knew that any fingerprints or blood
or anything, nothing would match me because I=d never been there.  I had nothing to do with it.@ 
Based on this testimony, we believe counsel was within the realm of
permissible argument and the trial court erred in sustaining the prosecutor=s objection.

Harm

Once again, we engage in a Rule
44.2(b) substantial rights analysis.  We
cannot see how this isolated incident harmed Allen, and he points us to no
specific harm.   The ruling did not
prevent Allen=s counsel from thoroughly discussing
the defense theory of the case with the jury. 
He discussed the dubious motives of the State=s witnesses and the lack of any
physical evidence connecting Allen to the crime scene, in detail and without
objection.  For example:

You=re not going to hear anything of physical evidence
from here.  You=re not going to hear anything about the physical
evidence from [the prosecutor] other than it doesn=t matter because you don=t have
it.  You got fingerprints that belong to
other people at that crime scene, you=ve got
DNA mixed in with that Reverend=s blood that belonged to other people at that crime
scene.  

 

And:

What
about that APIS computer?  Well, we did
it.  Well, can you show me the report
where you did it?  The national data base
where you can put fingerprints in and get them back if they match anybody?  Well, we did it.  Show me the report.  I don=t have
it.  Are you sure you did it?  Well, I think we did it.

 

What if
old John Robinson=s fingerprint had popped out of that?  Then he=d been
stuck saying well, yeah, I guess I was down there visiting the Reverend, buying
me a wallet a few days before that, but I didn=t have
anything to do with it.  They don=t want to look at the physical evidence.  They didn=t look
[at] the physical evidence.  The physical
evidence that=s here, they=ve tried
to minimize.  

 

And:








Ask
yourself, go back there and look at it, if this is the key to the case, why
didn=t they have some forensic testimony, laser analysis,
chemical analysis, fingerprint powder? 
Are you going to take their word, oh, it just wasn=t worth it?  We
couldn=t get anything. 


 

And:

 

What
about DNA analysis?  Doesn=t that show? 
Well, I hope it does because I=ve
fought as hard as I can for four days for this man.  And when I sit down I can=t fight any more for him.  And I can tell you one thing.  He is innocent.  

 

Defense counsel had ample opportunity to argue his case to
the jury, both before and after this single ruling he complains of on
appeal.  We do not believe a substantial
right was affected.  Issue Five is
overruled.

Evidence
that codefendant had been convicted of capital murder

In his sixth and final issue for
review, Allen urges that the trial court erred in overruling his objection to
evidence that Mozee had been found guilty of capital murder.  The State responds that Allen failed to
preserve error, or alternatively, that any error was harmless.

The exchange in question occurred
during the redirect examination of Detective Berry:

Q:        Okay.  And as far as Mr. Mozee, whether or not he
recanted it or didn=t believe it [his statement].  Mr. Mozee went to trial already, didn=t he?

 

A:        Yes, he
did.

 

Q:        He was
found guilty of capital murder, wasn=t he?

 








A:        That=s correct.

 

Q:        Nothing
further.

 

Defense
Counsel:  Your Honor, I=m going to object to that last question and answer. 

 

The
Court:  Overrule the objection.

 

Waiver

We first address the State=s contention that Allen has failed to
preserve error on this point.  To
preserve error for appellate review, the complaining party must make a timely,
specific objection.  Lozano v. State, 958
S.W.2d 925, 930 (Tex. App.--El Paso 1997, no pet.).  The objection must state the ground for the
ruling sought with sufficient specificity to make the trial court aware of the
complaint, unless the specific grounds are apparent from the context.  Id.

Here, Allen=s counsel never stated any ground for
objection, and we do not see that any ground was apparent from its
context.  Thus, we agree with the State
that the error was waived.  Allen=s sixth issue on appeal is overruled.

Conclusion

We affirm the trial court=s judgment.

 

                                                                        


SUSAN
LARSEN, Justice

July 11, 2002

 

Before Panel No. 1

Larsen, McClure, and Chew,
JJ.

 

(Do Not Publish)