Opinion issued August 11, 2010


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 


In The

Court
of Appeals

For The

First
District of Texas

————————————

NO. 01-08-00121-CR

———————————

Ashley Ervin, Appellant

 

V.

 

The State of Texas, Appellee



 



 

On Appeal from the 208th District Court

Harris County, Texas



Trial Court Case No. 1074292

 



 

O P I N I O N

          Appellant, Ashley Ervin, appeals from
a judgment convicting her for the capital murder of Brady Davis.  See Tex. Penal
Code Ann. § 19.03(a)(2) (Vernon Supp. 2009).  Appellant pleaded not guilty to the
jury.  The jury found her guilty, and,
because the State did not seek the death penalty, punishment was automatically
assessed at life imprisonment without parole. 
See id.  § 19.02(b)(1)
(Vernon 2003), § 19.03(a)(2) (Vernon Supp. 2009).  In seven issues, appellant
challenges the legal and factual sufficiency of the evidence to sustain the
conviction and the trial court’s admission of her three statements made to the
police, which she claims were made in violation of Miranda v. Arizona, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 1630
(1966).  We conclude that the evidence is
legally and factually sufficient; that the trial court properly admitted the first
two statements because statutory warnings were not required for appellant, who
was not in custody; and that the court properly admitted the third statement
that was made following waiver of Miranda
warnings because the evidence fails to show that the officers deliberately
employed a two-step interrogation technique to circumvent Miranda.  We affirm.

Background

          On May 25, 2006, while she was walking
from the bus stop near her house at around 5:30 a.m., Mary Ann Crutcher was
approached by a man in a hoodie threatening her with a semi-automatic gun.  He ran from her when she refused his demand
to give him any money and jewelry.  About
an hour after this attack, Davis was two blocks away at a carwash cleaning his
barbeque pit.  He was shot and killed
with a semi-automatic gun that used .380 caliber ammunition.  When she learned about his death, Davis’s
wife noticed that his cell phone was missing. 
Houston police officer A. Brown was assigned the Davis case, but he did
not have any information about who committed the offenses.  

One month later on June 23, officers with the homicide
division of the Houston Police Department were working together to solve a
missing persons report concerning the disappearance of Maria Aparece and Huy
Ngo, an offense that occurred three weeks after the Davis murder.  Officers Arnold and Termuelen were attempting
to locate Keithron Fields to execute a “pocket” arrest warrant for him for that
case.   The officers did not have a
warrant for appellant, and she was not a suspect.  Because Keithron was dating appellant, Officers
Arnold and Termuelen tried to locate him at appellant’s house, where she lived
with her mother, Serena Hawkins.  Keithron
was not at the house at 3:00 p.m. 
Hawkins, however, told the officers that appellant drove a black Nissan
and worked at McDonalds at Deerbrook Mall. 

At 4:30 p.m., Officers Arnold and Termuelen, who were in
plain clothes, went to the McDonalds at the Deerbrook Mall, where they found
appellant working the front cash register. 
They asked her if she would come with them because they were conducting
an investigation.  She was “very polite”
and agreed.  The officers asked appellant
about her car because they believed a black vehicle may have been used in the
Aparece and Ngo offense.  When appellant
showed them her black car, they asked for consent to search it, and she
agreed.  

At 5:40 p.m., while she was at the mall parking lot,
appellant signed a written consent allowing officers to search her black Nissan
Sentra.  The officers had the car towed
to the police department’s fingerprint stall. 
The keys to the car went with the car when it was towed, and officers
could not recall whether her house keys were on the same ring with her car keys
that went with the car.

          Officer Arnold asked appellant if she “minded”
coming to the police station to give a statement.  She agreed. 
But having agreed to allow the officers to tow her car, appellant needed
a ride to the police station to give her statement.  She rode to the station in a marked patrol
unit because no one with an unmarked car from the homicide division was
available to drive her to the station, and Officer Arnold still had work in the
field to complete.  Appellant left the
mall in the patrol car shortly after she signed the consent form.  She was not in custody, was not handcuffed,
and was free to leave if she wished, though she would have had to ask the
officer to let her out of the car because the car did not have door handles
inside the passenger compartment.  

          When she arrived at the police
station, she began speaking to Sergeant Motard at about 6:00 p.m.  Sergeant Motard was asked by Officer Miller,
who was investigating the Aparece and Ngo case, to speak to appellant.  Appellant was not handcuffed, was not in
custody, and was told by Sergeant Motard that “she was not under arrest and she
was free to go anytime she wanted to.” 
He explained that he did not read Miranda
warnings to her because she was not in custody and he did not view her as a
suspect.  He questioned her because she
was the girlfriend of one of the suspects, and her car may have been involved
in the Aparece and Ngo case.

At first, Sergeant Motard spoke to appellant in a conference
room near his desk, but then they moved to his cubicle to type the statement on
his computer.  Appellant was 17 years of
age, had completed 12 years of formal education, and was to begin her senior
year of high school that fall.  Before he
started speaking to her, Sergeant Motard offered her food, a drink, and the
opportunity to go to the restroom.   Appellant
declined all the offers. 

Appellant was cooperative as she spoke to Sergeant Motard about
the Aparece and Ngo case.  Appellant
revealed that she had a relationship with the people who were suspected of
committing the Aparece and Ngo offense.  Appellant
was dating Keithron; was the cousin of Tim Randle; was the “distant cousin” of
Alvie Butler; and was friends with Dexter Johnson, who in the past had lived
near her.  Appellant’s first written
statement described her mere presence at the capital murder of Aparece and Ngo committed
by Tim, Alvie, Keithron, and Dexter, when they were all in her black car with
her as the passenger.  Tim, the driver of
her car, dropped off Dexter, Alvie, and Keithron, who approached a blue car.  After a few minutes, she saw Dexter driving
the blue car, with Alvie in the back seat and Keithron in the front passenger
seat.  Tim followed the blue car to a
wooded area near a park.  Dexter pulled
into the woods, got people out of the blue car, and took them to the
woods.  Appellant then heard two
gunshots, with a small pause between the shots. 
Dexter and Keithron drove away in the blue car with Tim following them in
appellant’s car with her as the passenger. 
Dexter told appellant he shot the people in the head.  Appellant then went with the men to Keithron’s
apartment.   When she completed making
her statement, appellant signed it before a notary, representing that it was
true and correct to the best of her knowledge.  


          After appellant finished making the
first written statement, Sergeant Motard discussed appellant’s version of
events with other officers to see if it was consistent with what the officers
had learned from speaking to other people who had given information about the
Aparece and Ngo case.   Because he thought
the “same crew” that committed the Aparace and Ngo crime could be involved in
the Davis case, Officer Brown asked Sergeant Motard to ask appellant about the
unsolved Davis case.  This was a “fishing
expedition,” according to Sergeant Motard.   When appellant acknowledged she had some
information about the Davis case, Sergeant Motard decided to take a written
statement from her about that case. 

In the second written statement, appellant acknowledged that three
weeks before the Aparece and Ngo offense, she was with Dexter and Keithron when
they committed two other offenses on one night and early morning.  Appellant stated that when Keithron tried to
take money from a lady at a bus stop, appellant was in the passenger’s seat
while Dexter drove her car.  After that, appellant
became the driver of her car.  She drove Dexter
and Keithron to a carwash knowing they were going to rob someone there, left
them there, and picked them up after she heard a gunshot.  Appellant’s written description of the events
in the Davis case stated,

About three weeks ago, Dexter, Keithron, and I had
been out all night.  Dexter was driving
and I was in the back seat.  Keithron was
in the front seat.  Toward morning, I
fell asleep on the back seat while they were driving around.  Sometime around mid-morning, I heard the
passenger car door slam and awoke to see Keithron getting back in the car.  He was wearing a hoodie jacket and the hood
was on his head.  Keithron told Dexter
the woman didn’t have any money and we drove off.  We were in the neighborhood called Northwood
Manor.  Dexter drove around on the
streets looking for someone to get money from. 
Apparently, there was no one to get money from so Dexter stopped and let
me drive.  Dexter got in the back seat.

 

I started driving on Homestead toward Keithron’s
apartment in Humble.  I stopped at the
light on Homestead and Hartwicke and there was a carwash on the corner with a
man washing a large truck.  Dexter said, “Let us out here[.]”  Dexter and Keithron got out of my car.  I knew
they were going to rob someone in the carwash.  I turned down around and turned [off]
Homestead onto Guadalupe.  I drove around for two or three
minutes.  During that time I heard one
gunshot.  It was loud and came from the
direction of the carwash.  I pulled
back onto Guadalupe and saw Dexter and Keithron standing in the street.   They had their black hoodies on with the
hood up and they were holding their black bandana masks.  I stopped the car and the[y]
both got in.  Dexter and Keithron got
into the car and they were out of breath like they had been running. . . .  I drove
on to Keithron’s house and we went inside. . . .

 

(Emphasis added). 
Appellant said that Dexter and Keithron explained to her that they had
shot the man at the carwash because the man elbowed Dexter in an attempt to run
away.  According to Sergeant Motard, the
first time he learned that appellant was the driver in the Davis case was when
she told him during the time he took the second statement from her, and it was
at that point that he first felt she could be “possibly culpable.”

          The
remainder of the second statement by appellant described the weekend of June 10
when Keithron borrowed her car and later told her the car had been stolen.  The recovery of her car ultimately led to it
being towed to the police station.  When
the officers towed the car, they found marijuana and a firearm in the car, but
missed finding a .380 firearm that was under the back seat.  After recovering the car from the police
impound, appellant’s cousin Tim took a .380 firearm out of the car and gave it
to Dexter.  This evidence showed that
appellant knew that Dexter had the same caliber gun that was used to kill
Davis.  At the end of this written
statement, appellant represented that the statement she made was true and
correct to the best of her knowledge, and swore to its contents.    

After she
made the second written statement, appellant was told that Dexter, who had been
speaking to Officer Abbondondalo, wanted to speak with her if she wanted to
speak to him.  Appellant walked alone
from Sergeant Motard’s cubicle to Dexter, who was at Officer Abbondondalo’s
cubicle.  Dexter and appellant spoke
privately for several minutes before she returned to Sergeant Motard’s
cubicle.  When she returned to the
cubicle, she appeared teary eyed and emotional. Sergeant Motard believed she
was upset about “everybody’s circumstance that are her friends.”  Sergeant Motard and Officer Abbondondalo
drove appellant home at around 10:30 p.m. or 11:00 p.m. and told her mother
that appellant was hanging out with some bad guys and needed to stop doing
that.

          The
next day, June 24, the officers discussed the crimes and realized there was a
discrepancy between appellant’s statement, who said Alvie and not her brother,
Louis Ervin, were at the murders of Aparece and Ngo, and the statements by Tim,
Alvie, and Dexter, who said Louis was a participant.  Sergeant Motard was not sure whether
appellant’s version was correct or whether the statements by the men were
correct.  

          At
12:45 p.m., Sergeant Motard, Officer Brown, and Officer Abbondondalo went to
appellant’s house and saw a large group of people there.  Appellant agreed to return to the police
station to clarify her earlier statements. 
She changed clothes and then rode to the police station in an unmarked
Ford Taurus.  While walking to the
interview room, Sergeant Motard mentioned the discrepancy about whether it was
Louis or Alvie who was present at the Aparece and Ngo capital murder.  Appellant acknowledged the mistake, stating
it was Louis.  She then agreed to make
another statement.  This time, Sergeant Motard
used a tape recorder to document the statement because that method was easier
for him.  Sergeant Motard read appellant
her rights, explaining in his trial testimony that he did so “just as a
precaution.”  Appellant waived her
rights.  Appellant was offered food and a
drink.  She was allowed to use the
restroom upon request and, according to the officers, was not in custody.  The third statement, which began at 1:20 p.m.
and lasted about eight minutes, repeated the contents of the first and second
statements in that all the statements concern the same subjects, the capital
murder of Davis, and the capital murders of Aparece and Ngo.

          In
the third statement, the recording documented Sergeant Motard reading appellant
her rights and her waiver.  He reminded
her that last night she was at the police station, not under arrest, and had
made some statements.  He stated that it
was his understanding that she wanted to change her statements from the
previous night in order to correct some of the names of people she spoke
about.  In discussing the case about the man
at the carwash, appellant acknowledged that she drove the car and was with Keithron
and Dexter.  He asked her to finish in
her own narrative about what happened. 
She stated she was asleep in her car with Dexter driving.  She awoke when she heard Keithron slam the
car door after returning from a robbery of a woman.  She said Keithron stated the lady did not
have any money so he threw away her wallet. 
Sergeant Motard asked if the lady was shot.  Appellant said the lady was not shot.  Sergeant Motard asked if this was when she
became the driver instead of Dexter. 
Appellant said “yes.”  Appellant
said that she drove the car back towards Humble.  At some point, near the Homestead
intersection, Dexter and Keithron asked to be let out and she complied.  She let them out near a carwash.  Dexter and Keithron had guns in their hands,
and put on black bandanas and hoodies after they got out of the car.  Appellant drove, turned down a new street,
heard a shot, and then turned back around to drive back towards the carwash.  As she drove back, she saw Dexter and Keithron
in their hoodies standing in the middle of the street flagging her down.  She picked them up and they returned to Keithron’s
house.  She stated that Dexter told her
the man in the carwash elbowed him in an attempt to get away and that was why
he shot him.  She stated Keithron later
confirmed this story to her.  No money was
taken from the man.  After they returned
to Keithron’s house, Dexter was very interested in watching the news to see
what had happened to the man he shot.  

          When
appellant finished making the statement, she was shown where her family was
located in the family room at the police station.  Louis, her brother, had also arrived and was
speaking to a police officer.  Appellant
was not in handcuffs or in custody when she returned to be with her family.

          The
officers spoke to an assistant district attorney about whether charges would be
accepted on appellant.  When a judge
signed a probable cause warrant for appellant, Sergeant  Motard told appellant about the charge, and
she left the family waiting area to walk with him back to his cubicle to await
a patrol officer.  A patrol officer
handcuffed appellant and took her into custody after that. 

          Appellant
filed a written motion to suppress, which was litigated prior to trial before
the jury.  Officer Arnold and Sergeant Motard
testified, as well as appellant and her mother, Hawkins.  Appellant said she believed she was in
custody when she consented to the search and made the statements to the police.  Hawkins said she was not allowed to go with
the officers to speak to appellant when they initially went to the McDonalds
and that appellant did not answer her cell phone when Hawkins called her.  During cross-examination, Hawkins
acknowledged she had previously been twice convicted of felonies.  The trial court denied the motion to
suppress, making findings of fact and conclusions of law to support the ruling.

          At trial,
redacted portions of the three statements were admitted into evidence.  Appellant presented no evidence in her
defense.  The jury charge allowed the
jury to convict appellant as a principal actor, or as party by aiding in the
capital murder, or as a party as a conspirator. 


Sufficiency of the Evidence

In her fifth and seventh issues, appellant contends the
evidence is legally and factually insufficient to sustain her conviction
because the evidence failed to show that she entered into a conspiracy with Dexter
and/or Keithron to commit robbery, that Dexter or Keithron shot and killed
Davis in furtherance of the conspiracy, and that she should have anticipated
the killing of Davis as a result of carrying out the conspiracy.  We
determine that the evidence shows appellant’s guilt as a conspirator under the law
of parties.

A.      Legal and
Factual Sufficiency

In a legal sufficiency review, we
consider the entire trial record to determine whether, viewing the evidence in
the light most favorable to the verdict, a rational jury could have found the
accused guilty of all essential elements of the offense beyond a reasonable
doubt.  See Jackson v. Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App.
2007).  We “may not re-evaluate the
weight and credibility of the record evidence and thereby substitute our
judgment for that of the [factfinder].”  Williams,
235 S.W.3d at 750.  We give deference to
the responsibility of the factfinder to fairly resolve conflicts in testimony,
to weigh evidence, and to draw reasonable inferences from the facts.  Id. 
   

Evidence is factually insufficient
if, when all the evidence is examined neutrally, (1) the evidence supporting
the conviction is “too weak” to support the factfinder’s verdict or (2)
considering conflicting evidence, the factfinder’s verdict is “against the
great weight and preponderance of the evidence.”   Laster
v. State, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009).  In reviewing the factual sufficiency of the
evidence, we should afford almost complete deference to a jury’s decision when
that decision is based upon an evaluation of credibility.  Lancon v. State, 253 S.W.3d 699, 705
(Tex. Crim. App. 2008).  The jury may
choose to believe some testimony and disbelieve other testimony.  Id. at 707.  

Although appellant challenges the
admission of her statements, we address that matter separately from our
analysis of the sufficiency of the evidence. 
“It is well-settled that in reviewing evidence sufficiency claims, the
appellate court must consider all of the evidence presented, whether properly
or improperly admitted.”  Fuller v. State, 827 S.W.2d 919, 931
(Tex. Crim. App. 1992).

          B.      Capital Murder Under Conspiracy Theory of
Law of Parties 

A person commits capital murder if
she intentionally or knowingly causes the death of an individual and
intentionally commits the murder in the course of committing or attempting to
commit robbery or aggravated robbery.  Tex. Penal Code Ann. §§ 19.02(b)(1),
19.03(a)(2); Sholars v. State, No.
01-08-00060-CR, 2009 WL 3050866, at *8 (Tex. App.—Houston [1st Dist.] Sept. 24,
2009, pet. ref’d).  A person commits
robbery if, in the course of committing theft and with intent to obtain or
maintain control of the property, he intentionally, knowingly, or recklessly
causes bodily injury to another, or intentionally or knowingly threatens or
places another in fear of imminent bodily injury or death.   Tex.
Penal Code Ann. § 29.02(a) (Vernon 2003); Sholars, 2009 WL 3050866, at *8. 
Aggravated robbery is robbery with the use or exhibition of a
firearm.  Tex. Penal Code Ann. §§ 29.02, 29.03 (Vernon 2003); McElhaney v. State, 899 S.W.2d 15, 17
(Tex. App.—Tyler 1995, writ. ref’d). A firearm is a deadly weapon.  Tex.
Penal Code Ann. § 1.07(17) (Vernon Supp. 2009).

“[I]ntent to kill may be inferred
from the use of a deadly weapon, unless it would not be reasonable to infer
that death or serious bodily injury could result from the use of the
weapon.”  Sholars, 2009 WL 3050866, at *9; Dominguez v. State, 125 S.W.3d 755, 761 (Tex.
App.—Houston [1st Dist.] 2003, pet. ref’d) (holding evidence permitted inference of intent to kill when defendant
and other members of his gang planned to rob person walking alone at night,
and, in course of theft or attempted theft of complainant, defendant retrieved
loaded shotgun from car trunk and shot complainant in abdomen, resulting in
complainant’s death).  Intent may also be
inferred from the means used and the wounds inflicted, and is a factual matter to
be determined by the jury from all the facts and circumstances in evidence.  See
Hemphill v. State, 505 S.W.2d 560, 562 (Tex. Crim. App. 1974).  “When a deadly weapon is fired at close
range, and death results, the law presumes an intent to kill.”  Sholars,
2009 WL 3050866, at *9.

Under the law of parties, the jury
could have found appellant guilty of capital murder if it concluded that the
murder was committed in an attempt to carry out a conspiracy to commit aggravated
robbery with a deadly weapon, and, though appellant had no intent to commit the
murder, it was committed in furtherance of the unlawful purpose and should have
been anticipated as a result of the carrying out of the conspiracy.  Tex.
Penal Code Ann. § 7.02(b) (Vernon 2003); Love v. State, 199 S.W.3d 447, 452 (Tex. App.—Houston [1st Dist.]
2006, pet. ref’d).  In determining
whether the accused participated as a party, the court may look to events
occurring before, during, and after the commission of the offense.  Ransom
v. State, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994).  “Evidence that a defendant knew his
co-conspirators might use guns in the course of the robbery can be sufficient
to demonstrate that the defendant should have anticipated the possibility of
murder occurring during the course of the robbery.”  Love,
199 S.W.3d at 453.    

Since an agreement between parties to act together in common
design can seldom be proven by words, the State often must rely on the actions
of the parties, shown by direct or circumstantial evidence, to establish an
understanding or a common design to commit the offense.  Miller v. State, 83 S.W.3d 308, 314
(Tex. App.—Austin 2002, pet ref’d); see
Wygal v. State, 555 S.W.2d 465, 469 (Tex. Crim. App. 1977)
(circumstantial evidence sufficient to show guilt as party).  The agreement, if any, must be made before or
contemporaneous with the criminal event, but in determining whether one has
participated in an offense, the court may examine the events occurring before,
during, and after the commission of the offense.  Beier v. State, 687 S.W.2d 2,
3–4 (Tex. Crim. App. 1985); Miller, 83 S.W.3d at 314.  Presence at the scene may be considered in
determining whether a defendant was a party to the offense, but mere presence
at the scene without more is insufficient to prove guilt as a party.  Valdez v. State, 623 S.W.2d 317, 321
(Tex. Crim. App. 1979) (op. on reh’g); Miller, 83 S.W.3d at 314.  

C. 
    Analysis

Appellant’s guilt is established by
her own words documented in her second and third statements.  No evidence contrary to her statements was
admitted at the trial.  In her statements,
appellant admits that she drove Dexter and Keithron to the carwash where a man
was washing a barbeque pit in a large truck, and she dropped them off there.  She  admits she knew Dexter and Keithron both had guns.  She saw them put on their bandana masks and
hoodies as they got out of her car.  
She states that she “knew they were going to rob someone in the carwash.”  While the two men were robbing the man at the
carwash with a firearm, appellant acknowledges that she stayed nearby.  After she heard a loud gunshot coming from
the direction of the carwash, she returned to the location to pick up Dexter
and Keithron, who were standing on the street wearing black hoodies and holding
their black bandana masks.  Appellant
stopped her car, they got in the car, and she drove them from the carwash to Keithron’s
house.  

From this evidence, the jury could
have reasonably determined that appellant entered into an agreement with Dexter
and Keithron to commit the aggravated robbery of the man at the carwash, Davis,
because she drove them to the location, left them there with their guns and
wearing bandana masks and hoodies, knowing they were going to rob the man.  The jury could also have reasonably
determined that Dexter murdered Davis in furtherance of the conspiracy to rob
him because he shot him during the course of taking Davis’s cell phone that
Davis’s wife said was missing from Davis. 
Furthermore, from appellant’s statements, the jury could have reasonably
determined that she should have reasonably anticipated the murder of Davis by
Dexter as a result of the carrying out of the conspiracy because she knew he had
a loaded firearm when he went wearing a mask and hoodie to rob Davis.  She also knew that immediately before Davis
was killed, Dexter had driven Keithron to an area nearby where Keithron had
robbed a lady at a bus stop with a firearm. 

Viewing the evidence in the light
most favorable to the verdict, a rational jury could have found that appellant,
acting as a conspirator under the law of parties, was guilty of all essential
elements of capital murder beyond a reasonable doubt.  See
Love, 199 S.W.3d at 453.  Examining
the evidence neutrally, we conclude the evidence supporting the
conviction is not too weak to support the jury’s verdict.  See
Laster, 275 S.W.3d at 518.  Because no contrary evidence was introduced
at appellant’s trial, we also conclude the jury’s verdict is not “against the
great weight and preponderance of the evidence.”  See
Roberson v. State, 16 S.W.3d 156, 171 (Tex. App.—Austin 2000, pet.
ref’d).  We hold the evidence is legally and factually sufficient to sustain the
conviction as a conspirator under the law of parties.  

We overrule appellant’s fifth and seventh issues.  We need not address, therefore, appellant’s
fourth and sixth issues that assert the evidence is legally and factually insufficient
to convict her as a party by aiding the capital murder.

Motion to Suppress

Appellant
challenges the trial court’s denial of her motion to suppress the two written
statements and third statement, the tape recorded oral statement.  Appellant contends that the three statements
must be suppressed because she should have been given her statutory warnings
when she made the two written statements while she was in custody, and the
third statement repeated the contents of the first two statements, making the
warning preceding the third statement ineffective. 

A.      Standard
of Review

“A trial court’s
ruling on a motion to suppress, like any ruling on the admission of evidence,
is subject to review on appeal for abuse of discretion.”  Amador
v. State, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009); see Swain v. State, 181
S.W.3d 359, 365 (Tex. Crim. App. 2005).  “In
reviewing a trial court’s ruling on a motion to suppress, appellate courts must
view all of the evidence in the light most favorable to the trial court’s
ruling.”  State v. Garcia-Cantu, 253 S.W.3d 236, 241 (Tex. Crim. App.
2008).  

We conduct
our review of the trial court’s ruling through a bifurcated standard of
review.  St. George v. State, 237 S.W.3d 720, 725 (Tex. Crim. App.
2007).  We do not engage in our own
factual review, rather the trial court is the sole trier of fact and judge of
the credibility of the witnesses and the weight to be given to their
testimony.  Id.  Trial courts are given
almost complete deference in determining historical facts.  Id.  We are to “afford the same amount of
deference to trial courts’ rulings on ‘application of law to fact questions,’
also known as ‘mixed questions of law and fact,’ if the resolution of those
ultimate questions turns on an evaluation of credibility and demeanor.”  State
v. Ross, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000) (citing Guzman v. State, 955 S.W.2d 85, 89 (Tex.
Crim. App. 1997)).  We review de novo
“mixed questions of law and fact” not falling within that category.  Id.  

More specifically, a trial court’s ultimate
“custody” determination “presents a ‘mixed question of law and fact.’”  Herrera
v. State, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007).  Therefore, we afford almost total deference
to a trial court’s “custody” determination when the questions of historical
fact turn on credibility and demeanor.   Id. at 527.  Conversely, when the questions of historical
fact do not turn on credibility and demeanor, we will review a trial judge’s
“custody” determination de novo.  Id. 
Here, in assessing whether the trial court properly admitted the statements,
we must defer to the trial court’s findings that Sergeant Motard and Officer Arnold
were credible witnesses, and that appellant and Hawkins were not credible
witnesses.  See St. George, 237 S.W.3d at 725.

Appellant
suggests we should disregard the trial court’s findings concerning the
credibility of the witnesses.  The
record, however, contains conflicting evidence from the various witnesses about
many disputed facts.  Reconciliation of
the evidence based on who is credible is a matter uniquely reserved for the
trial court.  See id.  Furthermore, the impeachment
of the officers that is suggested in this case largely comes from resorting to
evidence presented in other trials—evidence not presented to the trial court in this
case.  But our task is to review the
evidence actually before the trial court in this case rather than resorting to
external facts not before the court when it made its decision.[1]  As noted above, we give almost complete
deference to the trial court’s custody determinations when those determinations
turn on the credibility of the evidence before the trial court.  See
Herrera, 241 S.W.3d at 526. 

The trial court made a pre-trial
determination that appellant’s statements were admissible.  At trial, the State asked Officer Arnold
questions concerning the issue of whether appellant was in custody.  Appellant cross-examined Officer Arnold on
the issue as well.  Both the State and
appellant also questioned Sergeant Motard extensively on this issue.  Although, generally, our review of a
pre-trial motion to suppress is limited to the evidence presented at the
pre-trial hearing, where, as here, the parties re-litigate the issue
during the trial on the merits, we review all the evidence presented.  Gutierrez v. State, 221 S.W.3d 680, 687 (Tex. Crim.
App. 2007); Rachal v. State, 917 S.W.2d 799, 809 (Tex. Crim.
App. 1996).  During
the trial, appellant’s attorney re-urged the objections to the introduction of
appellant’s statements and the trial court overruled the objections.  To the extent that the officers testified
differently at the trial than at the motion to suppress hearing, the trial
court considered that when it overruled appellant’s objections and when it made
its findings.  See Gutierrez, 221 S.W.3d at 687; Rachal, 917
S.W.2d at 809.  Because the trial court ruled on the admissibility
of appellant’s statements during trial, it considered the entire testimony of
the officers in making its credibility determination, and we must defer to that
finding.  See Herrera, 241
S.W.3d at 527; St. George, 237 S.W.3d at 725. 
  

We also
note that the standard of review for the law applicable to this case is the law
pertaining to statements taken from adults, not juveniles, as appellant
suggests on appeal.  Appellant contends
that because she had recently turned 17 years of age, the warnings for
juveniles should have been used in her case.  See Jeffley v. State, 38
S.W.3d 847, 854 (Tex. App.—Houston [14th Dist.] 2001, pet. ref’d).  The juvenile procedures are inapplicable,
however, because, at 17 years of age, appellant was an adult at the time of the
offenses.  See id.

B.      Analysis
of First Two Statements

 

          In her first
and second issues, appellant contends the trial court erred by admitting the
first two statements.  We address the
first two statements together because they were taken on the same day within a
short period of time under the same circumstances without Miranda warnings.  

1.                
Applicable Law for Admission
of Noncustodial Statements

 

In Miranda, the United States Supreme Court
determined that an accused, held in custody, must be given the required
warnings “prior to questioning.”  Jones v. State, 119 S.W.3d 766, 772
(Tex. Crim. App. 2003).  The failure to
comply with the Miranda requirements
results in forfeiture of the use of any statement obtained during that
interrogation by the prosecution during its case-in-chief.  Id.  Similarly, the Code of Criminal Procedure provides that a statement is
admissible against a defendant in a criminal proceeding if, among other things,
the defendant was given the warnings set out in section 2(a) of article 38.22 before
the statement was made and the defendant “knowingly, intelligently, and voluntarily”
waived the rights set out in the warnings. 
Herrera, 241 S.W.3d at 526; see also Tex.
Code Crim. Proc. Ann. art. 38.22, §§ 2(a), 3(a) (Vernon 2005).  

          For
a statement taken from a person in custody to be admissible, the person must be
informed of the following rights under the Code of Criminal Procedure:

(1)     he has the right to remain silent and not make any statement at
all and that any statement he makes may be used against him at his trial;

 

                   (2)     any statement he makes may be used as
evidence against him in court;

 

                   (3)     he has the right to have a lawyer present
to advise him prior to and during any questioning;

 

                   (4)     if he is unable to employ a lawyer, he has
the right to have a lawyer appointed to advise him prior to and during any
questioning;  and

 

                   (5)     he has the right to terminate the interview
at any time.

 

Tex. Code
Crim. Proc. Ann. art. 38.22, § 2(a); see
Woods v. State, 152 S.W.3d 105, 116
(Tex. Crim. App. 2004).  The warnings provided in the Code are
virtually identical to the Miranda
warnings, with one exception—the warning that an accused “has the right to terminate
the interview at any time” as set out in section 2(a)(5) is not required by Miranda. 
Herrera, 241 S.W.3d at 526.  As with the Miranda warnings, the warnings in article 38.22 of the Code are
required only when there is custodial interrogation.  Id.;
Woods, 152 S.W.3d at 116; Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a).  Our construction of “custody” for purposes of article 38.22
is consistent with the meaning of “custody” for purposes of Miranda. 
Herrera, 241 S.W.3d at 526.

Four general situations may
constitute custody for purposes of Miranda
and article 38.22: (1) the suspect is physically deprived of his freedom of
action in any significant way; (2) a law enforcement officer tells the suspect
he is not free to leave; (3) law enforcement officers create a situation that
would lead a reasonable person to believe that his freedom of movement has been
significantly restricted; and (4) there is probable cause to arrest the
suspect, and law enforcement officers do not tell the suspect he is free to
leave.  Gardner v. State, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009); see also Dowthitt v. State, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996).  The fourth category applies only when the
officer’s knowledge of probable cause is communicated to the suspect or by the
suspect to the officer; even then custody is established only “if the
manifestation of probable cause, combined with other circumstances, would lead
a reasonable person to believe that he is under restraint to the degree
associated with an arrest.”  Gardner, 306
S.W.3d at 295 n.48.       

 “[T]he question turns on whether, under the
facts and circumstances of the case, ‘a reasonable person would have felt that
he or she was not at liberty to terminate the interrogation and leave.’”  Nguyen
v. State, 292 S.W.3d 671, 678 (Tex. Crim. App. 2009).  The reasonable person standard
presupposes an innocent person.  Dowthitt, 931 S.W.2d at 254.  The subjective intent of law enforcement
officials to arrest is irrelevant, unless that intent is somehow communicated
or otherwise manifested to the suspect.  Id. 
“The determination of custody must be made on an ad hoc basis, after
considering all of the (objective) circumstances.”  Id. at
255; Martinez v. State, 171 S.W.3d
422, 430 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (citing Stansbury v. California, 511 U.S. 318,
323, 114 S. Ct. 1526, 1529 (1994)).  

Factors for
determining if a person is in custody include “whether the suspect arrived at
the place of interrogation voluntarily, the length of the interrogation,
whether the suspect’s requests to see relatives and friends are refused, and
the degree of control exercised over the suspect.”  Xu v.
State, 100 S.W.3d 408, 413 (Tex. App.—San Antonio 2002, pet. ref’d).  After examining each of those factors, we also
address whether there was probable cause to arrest appellant and whether any of
the four situations constituting custody were established.  Gardner, 306 S.W.3d at 294.  

2.                
Voluntariness of Arrival at Police Station

Appellant
contends she was in custody when she arrived at the police station because (a)
her car and keys were taken without her voluntary consent to search, (b) her
cell phone was taken from her, (c) she rode in a police car to the police
station, and (d) she was told she was not free to leave.  Neither the trial court’s findings nor the
record supports these assertions.

                             a.       The Car and Keys

The trial
court’s findings of fact expressly determine that appellant consensually agreed
to have the officers take her car for a search. 
The court finds:

5.  While at the defendant’s job, they asked for
consent to search her car after they learned it was a black Nissan Sentra which
had been described as possibly linked to the offense they were investigating.

 

6.  The defendant freely and voluntarily agreed
to the search of her vehicle . . . .

 

The record supports these findings.  In the consent form signed by her, appellant made the
following acknowledgements:

In giving this consent, I authorize the officers to
seize any and all letters, papers, materials, and other property that they
desire.

 

I understand that I have the right to refuse to give
this consent to search and can refuse to sign this form.

 

I further state that no promises, threats, force,
physical nor mental coercion of any kind have been used against me in order for
me to agree to sign this document and to consent to the search(es) that I have
authorized above. 

 

Appellant correctly notes that her car keys and possibly her
house keys went with her towed car. 
Officer Arnold’s trial testimony explained that the car keys likely went
with the car and tow truck driver, and that the house keys may have been with
the car keys.   Although he testified inconsistently at the pretrial motion
to suppress hearing by claiming that no one took appellant’s car or house keys,
Officer Arnold’s trial testimony stated, “[W]e keep the keys so the tower, the
wrecker driver[,] can do what he needs to do if he needs to turn the
wheel.”  The fact that the officers
towed her car and took her keys cannot be a basis for concluding appellant
believed she was in custody because the record shows appellant consented to
those actions.  See Dancy v. State, 728
S.W.2d 772, 777–79 (Tex. Crim. App. 1987) (finding no custody when suspect voluntarily
came with police to station, voluntarily answered questions, consented to give hair
samples, consented to allow police to take his shoes to run print comparisons,
and was arrested at conclusion of interview).

b.      Cell Phone 

 

Appellant claims
officers took her cell phone so she could not call anyone, and Hawkins states that
she tried to reach appellant by cell phone but could not that day.  However, the trial court found the testimony
by appellant and Hawkins as lacking in credibility.  In contrast, the trial court found credible
the testimony by the officers who said they did not take the cell phone so it
must have been with appellant.  Sergeant
Motard said appellant was free to call her mother if she wished and she did not
ask to use the telephone.  He
acknowledged, however, that he did not offer her the use of a telephone.  Because the evidence found credible by the
trial court showed that her cell phone was not taken from her by the officers,
appellant could not reasonably believe she was in custody for that reason.

c.       Ride in Patrol Car

 

Although appellant states she “felt
like [she] had to go with them because they told [her] to,” the trial court
found her testimony not to be credible. 
The findings of fact by the trial court determined appellant voluntarily
rode in the back seat of a patrol car from her work to the police station.  The findings of fact by the trial court state,


7.  The defendant voluntarily agreed to go to the
police station to be interviewed.

 

8.  She was driven in a patrol car to the
station, but she was not held against her will, handcuffed, or forced to
accompany the officer.

 

9.  She could have declined to go with police or
she could have requested to be returned to her job or home at any time.  Police would have complied with her request,
but she did not make one.

 

The record
supports the trial court’s findings.  Evidence
shows that Officer Arnold asked appellant if she “minded” going to the police
station to give a statement.  Officer
Arnold explained that the reason she rode in the patrol car rather than an
unsecured car was because all the homicide officers with unsecured cars were
unavailable.  Appellant was not
handcuffed.  Officer Arnold said that although she
was in a marked patrol car with no door handles on the inside, if appellant had
wanted to get out she could simply have asked the patrol officer to let her out
of the car.  Furthermore,
having voluntarily consented to having her car towed, appellant understood that
the reason she was riding in the patrol car was merely for a ride to the
station to give a statement, and not because she was in custody.  The ride in the police car would not
reasonably cause appellant to believe she was in custody because she consented
to have officers take her car to be searched, she was not in handcuffs, she was
asked if she minded going to the police station to give a statement, she
voluntarily agreed to go with the officers to the police station, the marked
police car was the only car available to drive appellant to the police station
to give a statement, and the officers would have honored any request by her to
not accompany them. 

d.      Free to Leave

Although
appellant claims she was not told she was free to leave, the trial court
expressly made findings contrary to that assertion when it stated,

11.  Before taking any statements, Sergeant Motard
informed the defendant that she was not under arrest and that she could leave
at any time.

 

.
. . . 

 

16.  Sergeant Motard did not threaten, coerce, or
promise the defendant anything in exchange for her statement.

 

.
. . . 

 

18.  The defendant agreed in her first written
statement that Sergeant Motard had told her she was not under arrest . . . . 

 

The trial court found credible the
testimony by Sergeant Motard, who testified that appellant was not handcuffed, was not in
custody, and was told by him that “she was not under arrest and she was free to
go anytime she wanted to.”  Sergeant
Motard explained that he did not view her as a suspect, but instead as the girlfriend
of one of the suspects and that her car may have been involved in the
offense.  Furthermore, the first
statement itself states, “I have been told I am not under arrest.”  The record, therefore, supports the trial court’s findings
that appellant knew she was not under arrest because she was expressly advised
of that fact.  See Oregon v. Mathiason,
429 U.S. 492, 495, 97 S. Ct. 711, 714 (1977) (holding person not in custody
when he came voluntarily to police station, was immediately informed that he
was not under arrest, participated in interview, and left police station
without hindrance).    

Although
her keys went with her car to the police station to be searched, we conclude,
based on the trial court’s findings and the record, that appellant was not in
custody when she arrived at the police station. 
Appellant voluntarily consented to accompany the officers to the police
station, and to have the officers search her car and take her keys.  The officers did not take her cell phone or prevent
her from making telephone calls.  Furthermore,
when she arrived at the police station, she was specifically told she was not
under arrest and could leave at any time.

 

3.       Length
of Interrogation

Appellant
was at the police station for four hours when she made the two written
statements.  The findings of fact state,
“The defendant remained at the station from approximately 6:00 p.m. until
approximately 10:00 p.m.”  From 4:30 p.m.
to 6:00 p.m. before she got to the police station, appellant was in the mall parking
lot with Officer Arnold, and then she rode with another police officer to the
police station.   

For approximately the first hour
from 6:00 p.m. to 7:05 p.m., appellant gave a statement about the Aparece and
Ngo capital murder that she witnessed when she was a passenger in her black
car.  Between 7:05 p.m. and 8:30 p.m.,
Sergeant Motard discussed with other officers what appellant had revealed to
him and he was asked to find out if she knew anything about the Davis case.  Briefly, just before 8:30 p.m., Sergeant
Motard asked appellant if she knew anything about the Davis case and she said
she did.  He “asked her if she would make
another statement as to that, and she agreed.” 
The second statement began at 8:30 p.m. and ended at 9:15 p.m.  

Here, the four
hour period of time at the police station does not constitute a length of time
that would cause a reasonable person to believe that she was in custody because
that length of time was necessary due to the amount of information being
received from appellant about the multiple crimes committed by the group of
people with whom she associated. 
Appellant revealed extensive information about how she witnessed four
people commit a capital murder of two people, an auto theft report to the
police when Keithron had her car, the robbery of a lady at a bus stop, and the
capital murder of Davis.  The amount of
information, combined with the other circumstances that show appellant was at
the police station voluntarily, demonstrate that she did not reasonably believe
she was in custody when she was with police officers at the police station for
four hours.  See Meek v. State, 790
S.W.2d 618, 622 (Tex. Crim. App. 1990) (finding no custody when suspect came to
station voluntarily at time of his own choosing, was allowed to step outside
building and go unaccompanied to his car during interviews, and “a few hours”
later was allowed to leave unhindered after statements were completed); State v. Rodriguez, 986 S.W.2d 326, 330
(Tex. App.—El Paso 1999, pet. ref’d) (determining appellant not in custody
although interrogation lasted several hours); Bradley v. State, 960 S.W.2d 791, 794–95 (Tex. App.—El Paso 1997,
pet. ref’d) (determining interrogation lasting approximately six hours was
noncustodial).  

4.       Access
to Relatives and Friends

Appellant
had access to her relatives and friends. 
She spoke to Dexter privately after she made the second statement.  The trial court made findings of fact, as
follows:

25.  After giving both statements, Sergeant Motard
learned that Dexter wanted to speak with the defendant.

 

26.  Sergeant Motard asked the defendant if she
wanted to speak with Dexter, and she stated that she did.

 

27.  Sergeant Motard and [Officer] Abbondondalo
permitted the defendant and Dexter to converse privately for approximately five
minutes.   

 

The record shows
that after she completed the second statement, appellant spoke to Dexter
because, according to Sergeant Motard, “she was not under arrest,” and she
wanted to speak to him when she was told that he wanted to speak to her.  Appellant walked alone from Sergeant Motard’s
cubicle to Officer Abbondondalo’s cubicle where Dexter was, and the two spoke
privately for several minutes before she came back to Sergeant Motard’s
cubicle.  When she returned to the
cubicle, she appeared teary eyed and emotional. 
Sergeant Motard believed she was upset about “everybody’s circumstance
that are her friends.”  This private
visit with Dexter away from the officers shows appellant did not reasonably
believe she was in custody.  See Meek,
790 S.W.2d at 622 (finding no custody in part because Meek was allowed to step
outside building and go unaccompanied to his car during interviews).  

  Hawkins said the officers told her she could
not go with them when they went to talk to appellant at the McDonalds, but the
trial court found her testimony as lacking in credibility.  The record, therefore, does not support the
claim that Hawkins was denied access to appellant before appellant went to the
police station and while she was there.

  Furthermore, appellant went home after she
made the statements.  The trial court
found that “Sergeant Motard and [Officer] Abbondondalo then drove the defendant
home and left her there.”  Sergeant
Motard drove appellant home at around 10:30 p.m. or 11:00 p.m. and told her
mother that appellant was hanging out with some bad guys and needed to stop
doing that.  Evidence that appellant went
home after making the two statements shows that she did not reasonably believe
that she was in custody.  See California v. Beheler, 463 U.S. 1121,
1124–25, 103 S. Ct. 3517, 3519–20 (1983) (holding person not in custody based
on facts that he voluntarily accompanied police to station, talked to officers,
and was permitted to return home).  We
conclude that appellant’s access to her friend, Dexter, when she was at the
police station, and to her family when she went home after making the second
statement, are facts that show she did not reasonably believe she was in
custody during the time she was at the police station making the first two
statements. 

5.       Degree of Control Exercised

Appellant
testified that she did not feel like she could leave, was scared, and felt she
had to do whatever the officers asked so that she would be allowed to go home.  She also claims she did not feel comfortable
requesting to go to the restroom even though she needed to go.  The trial court, however, found her testimony
as lacking credibility and made findings contrary to these assertions.

The trial court’s finding states, “Police did
not restrict the defendant’s freedom of movement while she was at the police
station.”  The record shows officers did not
handcuff appellant nor restrict her freedom of movement in any way while she
was at the police station.  She walked
alone to speak privately with Dexter. 
Furthermore, the court found, and the record shows, that “Sergeant
Motard spoke to the defendant in a conference room, and then he took her to his
cubicle where he typed out a written statement while she described the events.”  

The trial
court determined that appellant was offered basic necessities, as shown by a finding
of fact that states, “Sergeant Motard offered the defendant food and drink, but
she declined.”  The trial court also
found that “the defendant did not request to use the restroom; but had she
requested it, he would have directed her to a nearby restroom.”  The record shows that Sergeant Motard
explained that an officer would have shown appellant where the restroom was
because she would not know how to get there, but appellant never requested to
go to the restroom.  He also offered her
the opportunity to go to the restroom before she began the first statement.      

The trial
court made findings specifically determining that appellant voluntarily signed
the second written statement, as follows: 

22.  The defendant signed the statement after
Sergeant Motard told her to sign it “if it’s correct.”

                                      

23.  Sergeant Motard did not threaten, coerce, or
promise the defendant anything in exchange for the second written statement.

 

24.
The defendant chose of her own free will to sign the second statement.

 

The record supports these findings
and shows that Sergeant
Motard did not promise appellant anything for her giving the statement. 

Because the evidence shows the
officers did not exercise the degree of control associated with an arrest, the
evidence fails to show appellant reasonably believed she was in custody.  Compare
with Jones, 119
S.W.3d at 776 (finding person in custody based on facts that he was incarcerated
in jail, taken to small room to meet with two officers, and confronted with information
that someone had identified him as murderer).

6.       Probable Cause

Appellant
asserts that the police believed her to be a suspect when they went to her
house looking for Keithron.  Hawkins
contends the officers knew appellant worked at McDonalds before Hawkins told
them that.  But Officer Arnold testified
that appellant was not a suspect and that they learned where to find her from
what Hawkins told him.  The trial court found
Officer Arnold more credible than Hawkins and appellant.  Furthermore, even if appellant was the focus
of the investigation, it would not render her as being in custody for purposes
of Miranda or article 38.22.  See
Gardner, 306 S.W.3d at 294.

Appellant
suggests officers had probable cause to arrest her when she made the first
statement acknowledging she witnessed the Aparece and Ngo capital murder.  In that statement, however, appellant said
she was merely present as a witness at the events.  See
Valdez, 623 S.W.2d at 321 (mere presence
insufficient to convict).  There was no
probable cause to arrest her for the Aparece and Ngo offense. 

Appellant claims
that after she signed the first statement, Sergeant Motard left her and then
returned and told her that someone had informed him that she was the driver in
the Davis murder.  Appellant also
contends Sergeant Motard was going back and forth to discuss her version with
the other officers while he was taking her statement.  The record, however, does not support these
assertions.  The trial court found
appellant’s testimony concerning these events not credible.  Furthermore, Sergeant Motard explained that he
discussed appellant’s version of the Aparece and Ngo case with other officers
to attempt to reconcile her statement with the statements of the other people
who had given statements about that case, but he did so during the break
between the first and second statements. 
He did not testify that he was going back and forth to talk to the
officers about what appellant told him as she was making the statement.  Appellant was not considered a suspect until
she acknowledged she was the driver in the Davis case.    

The trial
court made a finding of fact stating, “Sergeant Motard did not suspect the defendant in the Brady
Davis case, and he did not know her level of participation when he spoke to her
about it.  She was not the focus of the
investigation because he believed she was, at most, a witness.”  The record shows that when Sergeant Motard
asked appellant about the Davis case that it was a fishing expedition.  When appellant admitted during the making of
the second written statement that she was the driver in the Davis case, the
officers first had probable cause to arrest her.

7.       Four “Custody” Situations Did Not Occur

Deferring to the trial court’s
findings of fact based on the credibility of the witnesses, the first three
situations where custody is established are not shown here.  More specifically, (1) appellant was not physically
deprived of her freedom of action in any significant way, (2) an officer told
her she was free to leave, and (3) the officers did not create a situation that
would lead a reasonable person to believe that her freedom of movement had been
significantly restricted.  See Gardner,
306 S.W.3d at 294; Dowthitt, 931
S.W.2d at 254. 

Concerning
the fourth situation where “custody” occurs, the record shows there was
probable cause to arrest appellant when she admitted being the driver in the
Davis case, but the officer never did anything to manifest to her that he
believed there was probable cause to arrest her.   See Gardner, 306 S.W.3d at 295 n.48.   The record does not show that appellant reasonably
knew that by admitting to being the driver in the Davis case that the officer
had probable cause to arrest her.  See id. 
Furthermore, the other circumstances detailed above would not lead a
reasonable person to believe that she was under restraint to the degree
associated with an arrest.  See id.    

 Not only did she voluntarily make the written
statements, appellant went voluntarily to the police station, was told she
could leave, remained unhandcuffed throughout the statements, was at the
station four hours to discuss two separate capital murders, went unescorted to
speak privately with Dexter, and went home after she made the statements.  Under these circumstances, a reasonable person
would not believe that she was under restraint to the degree associated with an
arrest.  See id.; Garcia v. State,
106 S.W.3d 854, 858–59 (Tex. App.—Houston [1st Dist.] 2003, pet. ref’d) (holding
reasonable person in Garcia’s situation would not have believed he was in
custody because, although there was probable cause to arrest Garcia, he
voluntarily went to police station, was told that he could leave, voluntarily
gave statement, statement took 30 minutes, only two unarmed officers were with
him, he was taken to visitor’s room where he was left, unguarded, with his
girlfriend, and nothing prevented him from simply leaving police station); Trejos v. State, 243 S.W.3d 30, 47 (Tex.
App.—Houston [1st Dist.] 2007, pet. ref’d) (finding no custody when suspect “rode
with a police officer to the station” and “was only interviewed by one police
officer, who was in plain clothes, and in an office-like setting”); compare with
Dowthitt, 931 S.W.2d at 254
(“custody” began when Dowthitt admitted to his presence during murders because
“a reasonable person would have realized the incriminating nature of the
admission,” and other factors were present that “involv[ed] the exercise of
police control” over him, such as lengthy interrogation lasting over 12 hours,
police officers accompanying him to restroom, and police officers ignoring his
requests to see his wife).

8.       Conclusion

We conclude
the record shows that appellant did not reasonably believe she was in custody
because she voluntarily went to the police station, the length of the
interrogation was not so long that she would have believed she was in custody,
she had access to her friends and family, the officers did not exercise the
degree of control over her that would be associated with an arrest, the
officers did not have probable cause to arrest her until the point in her
second statement when she admitted driving Dexter and Keithron to and from the
aggravated robbery of Davis, and the officers did not manifest to her that they
had probable cause to arrest her nor did the circumstances show she was in
custody.  The trial court made findings
of fact and conclusions of law supporting the conclusion that appellant was not
in custody, and those findings and conclusions are supported by the
record.  We must afford almost total
deference to the trial court’s determination that appellant was not in custody
when she made the two written statements. 
See Herrera, 241 S.W.3d at 526–27.  We must do so because under these
circumstances the question of whether appellant was in custody is a mixed
question of law and fact that turns on the credibility determinations made by
the trial court, which found appellant and her mother not credible and the
officers who testified credible.  See id. 
Because appellant was not in custody when the first two statements
were made, Miranda warnings were not
required.  Id. 
We hold the trial court did not abuse its discretion by
denying the motion to suppress the two written statements by appellant and
admitting redacted portions into evidence at her trial.  

          We
overrule appellant’s first and second issues.

C.      Analysis
of Third Statement

In her third issue, appellant
contends the third statement must be suppressed because, although she received Miranda warnings before the statement
was made, the statement was merely a rehash of the two earlier written
statements that were unlawfully obtained because they were made without the Miranda warnings.  We address (1) the law concerning midstream
warnings, (2) appellant’s challenge premised on the invalidity of the first two
statements, (3) the evidence that the two step questioning tactic was not
employed, and (4) the evidence concerning whether curative measures were taken in
this case.

1.       Law
Concerning Midstream Warnings  

Midstream Miranda warnings are not permissible.  See
Missouri v. Seibert, 542 U.S. 600,
601, 124 S. Ct. 2601, 2604 (2004) (plurality holding that whenever two-stage
interview occurs and Miranda warnings
are delivered “midstream,” admissibility of post-warning statement depends on
whether warnings could have been effective to accomplish objective); Martinez v. State, 272 S.W.3d 615, 621–27
(Tex. Crim. App. 2008) (holding that two-step interrogation technique was used
in calculated way to undermine Miranda
warning, as shown by totality of circumstances that Martinez was in custody;
officer did not give him Miranda
warnings before questioning him; Martinez made statements to polygraph
examiner; after Miranda warnings,
Martinez was confronted with facts learned from polygraph examiner; and entire
statement to officers occurred within short period of time at same police
station where polygraph occurred).

  Courts should examine whether the officer
deliberately used a two-step, “question first, warn later” strategy.  Carter
v. State, 309 S.W.3d 31, 36 (Tex. Crim. App. 2010).  If the court finds a deliberate effort, then
post-warning statements must be excluded unless “curative measures” are taken
before the post-warning statement is made. 
Id.  “[C]urative measures should be designed
to ensure that a reasonable person in the suspect’s situation would understand
the import and effect of the Miranda
warning and of the Miranda
waiver.”  Martinez, 272 S.W.3d at 621. 
An appropriate curative measure, for example, is a substantial break in
time and circumstances between the unwarned statement and the Miranda warning.  Id.  Curative measures allow the accused to
distinguish the two contexts and appreciate that the interrogation has taken a
new turn.  Id. 

Courts
should determine “whether the evidence shows that [the interrogating officer]
deliberately employed a two-step ‘question-first, warn later’ interrogation
technique to circumvent [the] appellant’s Miranda
protections.”  Carter, 309 S.W.3d at 38. 
Because the “question of whether the interrogating officer deliberately
withheld Miranda warnings will
invariably turn on the credibility of the officer’s testimony in light of the
totality of the circumstances surrounding the interrogation,” a factual finding
regarding the officer’s credibility is entitled to deference on appeal and is
reviewed only for clear error.  Id. at 39.  

 Where the two-step questioning tactic is not
deliberately employed, “a suspect who has once responded to unwarned yet
uncoercive questioning is not thereby disabled from waiving his rights and
confessing after he has been given the requisite Miranda warnings.”  Oregon v. Elstad, 470 U.S. 298, 318, 105
S. Ct. 1285, 1298 (1985); Carter, 309
S.W.3d at 36.  In this situation, where
the first statement is unwarned but not coerced, “the admissibility of any
subsequent statement should turn . . . solely on whether it is knowingly and
voluntarily made.”   Elstad, 470 U.S. at 309, 105 S. Ct. at 1293; Carter, 309 S.W.3d at 32. 
“Unless a deliberate two-step strategy is employed, Elstad applies.”  See Carter, 309 S.W.3d at 37.

2.       Appellant’s Challenge 

Appellant’s
entire reason for asking that the third statement be suppressed is her theory
that the first two statements were taken unlawfully because Miranda warnings were not given when she
made the statements while in custody.  We
have already determined, however, that because appellant was not in custody
when the first two statements were given, Miranda
warnings were not required.  Because
appellant’s challenge to the third statement is premised solely on the failure
to give Miranda warnings before the first
two statements were taken, a ground we have determined lacks validity because
appellant was not in custody, we hold the trial court properly admitted the
third statement by appellant.  See Martinez,
272 S.W.3d at 621–27.  

3.       Evidence that Two-Step Questioning Tactic
Not Employed 

But even if
we assume the trial court erred by determining appellant was not in custody
when she made the first two statements, the trial court made findings supporting
the determination that the officers did not employ a two-step questioning
tactic to violate the principles of Miranda.  The trial court found the officers’ testimony
credible when they explained that they did not read the warning to appellant
because they determined she was a witness to the events and not in custody.  See
Seibert, 542 U.S. at 614, 124 S. Ct. at 2611 (observing that Elstad court took care to mention that officer’s
initial failure to warn was “oversight” that may have been result of confusion
as to whether brief exchange qualified as “custodial interrogation”).  Because the trial court found credible the
officers’ testimony that appellant was not in custody when she made the first
two statements, even if the officers erred in their belief that she was not in
custody, that error does not amount to a deliberate tactic to circumvent Miranda. 
The trial court found credible Sergeant Motard’s explanation that
questioning appellant about the Davis case was a “fishing expedition,” and it
determined the circumstances showed appellant was not in custody when she
admitted her role in the Davis case.  At
most, if the officers were wrong about whether appellant was in custody, that
error shows a mistake, but, in light of the trial court’s factual findings
based on the credibility of the witnesses, it does not show a deliberate tactic
to employ a two-step interrogation technique. 
Additionally, the evidence fails to show that the third statement taken
after Miranda warnings were given to
appellant was calculated to undermine the Miranda
warning because the third statement was taken after appellant went home for the
evening to spend the night with her family and was taken only after she
returned to the police station around noon the next day.  Cf.
Martinez, 272 S.W.3d at 621–27 (concluding
two-step interrogation technique was used in calculated way to undermine Miranda warning, based in part on
evidence that all statements to officers occurred within short period of time
at same place at police station).

We hold the
record fails to show the officers deliberately used a two-step, “question
first, warn later” strategy.  See Carter,
309 S.W.3d at 36.  The record, therefore,
fails to show the trial court committed clear error in admitting the third
statement.  See id.  In the absence of a deliberate
two-step questioning tactic, the principles in Elstad apply.  Carter, 309 S.W.3d at 37 (“Unless a
deliberate two-step strategy is employed, Elstad
applies.”).  

Under Elstad, the third statement is
admissible if appellant waived her rights after having been given the requisite
Miranda warnings and if she made the
statement knowingly and voluntarily.  See Elstad, 470 U.S. at 309, 105 S. Ct. at
1293; Carter, 309 S.W.3d at 32.  Because the tape recording shows that
Sergeant Motard read appellant her Miranda
rights at the start of the third statement and that she subsequently made
voluntary and knowing statements demonstrating her culpability in the crime, we
hold that even if the first two statements were inadmissible for failure to
give Miranda warnings to a person in
custody, the third statement would be admissible under Federal and Texas case
precedent.  See Elstad, 470 U.S. at 309, 105 S. Ct. at 1293; Carter, 309 S.W.3d at 32.  We also hold that the admission of the third
statement would render the erroneous admission of the first and second
statements harmless beyond a reasonable doubt because the first statement did
not mention the Davis case and the second statement’s contents were fully
contained within the third statement.  See Jones, 119 S.W.3d at 777.

4.       Evidence of Curative Measures

We have
determined that the trial court properly admitted the three statements because
appellant was not in custody when the first two statements were made and Miranda warnings were not required.  Alternatively, we have determined that,
assuming appellant was in custody when she made the first two statements so
that Miranda warnings were required,
the third statement, provided after Miranda
warnings were given, is admissible because a deliberate two-step
questioning technique was not employed and the third statement was voluntarily
made.  We need not address, therefore, a
third alternative way of upholding the judgment, which would apply if the
record shows that curative measures were taken between the unlawful statements
and the lawful statement.  See Seibert, 542 U.S. at 615, 124 S. Ct.
at 2612 (stating that in Elstad “the
Court thought any causal connection between the first and second responses to
the police was ‘speculative and attenuated’”). 
Here, the third statement was made after appellant waived her statutory
rights after she had been home for approximately 14 hours from 10:00 p.m. on
June 23 to noon on June 24.  She was at
home with her family before she returned to the police station voluntarily,
unhandcuffed, and in an unmarked car to clarify her earlier statements.   

Appellant focuses
on Sergeant Motard’s use of the word “rehash” when describing the contents of
the third statement in comparison to the contents of the second statement.  As used in this case, “rehash” means that the
substance of the statements was the same—the events transpiring on the day
Davis was killed and on the day Aparece and Ngo were killed.  The third statement, however, consists of approximately
a five minute narrative by appellant where she explains the events about the
Davis case and it was in this narrative that she made the inculpating
statements.  Although the record includes
factors that weigh towards a finding that curative measures were taken between
the first two statements and the third statement, we need not decide whether the
break in time and circumstances between the second and third statements show
that the third statement was made independently of second statement so that the
Miranda warnings were effective.  See
Martinez, 272 S.W.3d at 621
(observing that appropriate curative measure is substantial break in time and
circumstances between unwarned statement and Miranda warning).  The reason
we need not reach this decision is because this would be a third alternative
way of upholding the judgment, which is unnecessary in light of our other
holdings.   

We hold the
trial court properly admitted the third statement because the first two
statements did not violate the requirements of Miranda or the Code of Criminal Procedure due to the evidence that
appellant was not in custody when she made the first two statements, and,
alternatively, because the trial court’s findings and evidence do not show that
the officers deliberately employed a two-step strategy to circumvent the
requirements of Miranda.

We overrule
appellant’s third issue.

Conclusion

          We affirm
the conviction.

 

                                                                   

 

                                                                   Elsa
Alcala

                                                                   Justice

 

Panel
consists of Justices Keyes, Alcala, and Hanks. 


Justice Keyes, dissenting.

Publish.  Tex. R.
App. P. 47.2(b).

 











[1]
          It is suggested that an opinion
in an appeal, which concerns someone other than appellant, characterizes
appellant as having been arrested when she went to the police station.  But that appellate opinion is not part of the
record in this case, and does not purport to make a legal analysis or determination
that appellant was under arrest. 
Furthermore, in the record before us appellant did not introduce any
evidence that would impeach any of the officers with testimony they may have
given in another proceeding.  No evidence
introduced in this case shows the officers testified inconsistently in another
proceeding.  If that type of evidence
exists, then that may be a basis for a post-conviction habeas corpus challenge
that would assert trial counsel was ineffective for failing to present
impeaching evidence to the trial court. 
But absent any evidence that shows inconsistent testimony by the
officers in other proceedings, and absent any prior appellate determination
that analyzes whether appellant was arrested, the record in this case fails to
show the trial court clearly erred by finding the officers credible.